Donna **MASTRANTUONO** and Juan Mastrantuono, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

Samantha Bellantoni, Plaintiff,

v.

United States of America, Defendant.

Nos. 99 Civ 11105 WCC, 99 Civ 11353 WCC.

United States District Court, S.D. New York.

Sept. 17, 2001.

Richard J. Coffey of counsel, Feldman, Kleidman & Coffey, LLP, Fishkill, New York, for plaintiffs Donna Mastrantuono and Juan Mastrantuono.

Robert P. Ianelli of counsel, Robert P. Ianelli, Fishkill, New York, for plaintiff Samantha Bellantoni.

Elizabeth Wolstein, Eric B. Fisher, Asst. United States Attorneys of counsel, Mary Jo White, United States Attorney for The Southern District of New York, New York City, for defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Samantha Bellantoni ("Bellantoni") and Donna Mastrantuono ("Mastrantuono") bring this action against de-

fendant United States of America pursuant to the Federal Torts Claim Act, 28 U.S.C. §§ 1346(b)(1), 2671–80 ("FTCA"), seeking both economic and non-economic damages for personal injuries sustained in an automobile accident on November 8, 1997. Plaintiff Juan Mastrantuono, Mastrantuono's husband, seeks compensation for loss of services.

On July 23 and July 25, 2001, this Court conducted a bench trial. Because defendant conceded liability prior to trial, the only issues before us concern whether Bellantoni and Mastrantuono incurred a "serious injury" as defined under N.Y.INS.LAW §§ 5101–08 ("No–Fault Law"), and, if so, the extent of such injury and the appropriate damages therefor. For the reasons stated hereinafter, we enter judgment in favor of Bellantoni in the amount of $100,000, in favor of Mastrantuono in the amount of $150,000 and in favor of Juan Mastrantuono in the amount of $50,000. Pursuant to FED.R.CIV.P. 52(a), we set forth below our findings of fact and conclusions of law.

## FINDINGS OF FACT

At approximately 2:30 p.m., on November 8, 1997, Bellantoni's car was stopped at a red light at the intersection of Route 9D and Verplank Avenue in Beacon, New York. Her mother, Mastrantuono, was the front-seat passenger. (Tr. at 4–5.) Bellantoni's car was struck in the rear by a tow truck driven by United States Postal Service employee Harold Holmes, who was acting within the scope of his employment. Bellantoni's car was knocked forward and struck the automobile in front of hers. (Stmt. Agreed Facts ¶¶ 5–8; Tr. at 4–7.)

Although they were wearing their seat belts at the time of the collision (Tr. at 7, 66, 106), both women were jerked backward, forward and backward again by the impact. (Tr. at 8, 68.) Bellantoni's chest hit the steering wheel and Mastrantuono's head hit and cracked the dashboard. (Tr. at 8, 68, 107.) The rear window of the car was shattered, the headlights and taillights were broken and the bumper was damaged. (Tr. at 34, 69.) There was no substantial damage to the third car and its occupants, a woman and children, who appeared uninjured and unconcerned. (Tr. at 45, 108.) Although there were no post-accident photographs of her automobile, Bellantoni testified that the repairs to it cost approximately $2,300. (Tr. at 34–35, 46, 107.)

### A. *Bellantoni*

At the scene of the accident, Bellantoni complained of lumbar and cervical pain. (Tr. at 10.) For her protection, she was transported to the emergency room on a stretcher and with a neck collar. (*Id.*) She remained at the hospital for approximately 4 to 5 hours, during which time she underwent cervical and lumbar x-rays and a cervical CT-scan. (Tr. at 11.) The results indicated that she did not suffer any fracture, but rather a sprain. (Tr. at 11–12.) She was given an unspecified pain medication plus aspirin and advised to follow up with her primary care physician. (Tr. at 12.)

Heeding this advice, Bellantoni sought medical assistance from two primary care physicians, Drs. Robert Kaplan and John Supple, and a neurologist, Dr. Chan Soo Park, to whom she complained of neck, back and lower extremity pain. (Tr. at 12–15, 54.) Each of the doctors described Bellantoni's injuries as either a strain or a sprain. Drs. Kaplan and Supple prescribed some muscle relaxers; Dr. Park provided no medical treatment. (Tr. at 13–15, 54; Def.Ex. N.)

On December 1, 1997, Bellantoni visited Dr. Richard Peress, an orthopedic surgeon, and has continued under his care

248

until the present day. (Tr. at 15–16, 198, 200.) At the initial visit, Dr. Peress did not review any of Bellantoni's prior medical records. (Tr. at 246–47.) Bellantoni also failed to tell him that for approximately 10 years prior to the accident she had made similar complaints of neck, back, buttock, leg and feet pain, and had been treated for migraine headaches. (*Id.; see* Tr. at 50; Def.Ex. I–2.) Nor did Bellantoni tell Dr. Peress that in 1996 she had been placed on antidepressant medication. (Tr. at 248; *see* Tr. at 51; Def.Ex. I–2.)

The only information Bellantoni disclosed to Dr. Peress about her medical history concerned the November 8, 1997 accident and a prior back injury she sustained in 1996. (Tr. at 199–200, 246; Def. Ex. B–1.) Bellantoni, employed as a housekeeper at the Residence Inn, twisted her back while lifting a vacuum cleaner. (Tr. at 52–53.) Although she did not consider this to be a serious injury, she missed approximately 1 to 2 weeks of work thereafter. (*Id.;* Def.Ex. B–1.)

At the initial visit, Dr. Peress determined that Bellantoni had a focal area of tenderness in the mid-cervical spine region that became aggravated by extension maneuvers, bilateral flexion and rotation. (Tr. at 201; Def.Ex. B–1.) No pain radiated from the thoracic spine region and she had a positive straight leg raise on the right side. (*Id.*) Although his initial impression, based exclusively on his physical examination and without x-rays or MRIs, was a possible derangement of the cervical and lumbar regions (Tr. at 234),[1] Dr. Peress recommended one month of physical therapy for what he described as "cervical whiplash and lumbosacral sprain." (Tr. at 257–58; Def.Ex. C–1.) Bellantoni attended five physical therapy sessions from which

she found no relief. (Tr. at 47–48; Def. Ex. C–2.) Dr. Peress did not recommend any further therapy. (Tr. at 202.)

On December 10, 1997, Bellantoni underwent cervical x-rays that showed loss of lordosis or straightening of the cervical curvature. (Tr. at 201, 282; Def.Ex. JJJ–1.) Dr. Daveed D. Frazier, defendant's expert witness, explained that the normal curvature of the neck is within a range of 20 to 45 degrees. (Tr. at 282.) The December 10, 1997 x-rays reportedly showed curvature of approximately 6 degrees, placing Bellantoni's deficiency of lordosis at some 14 degrees. (Tr. at 282–84.) On January 21, 1998, Bellantoni underwent an MRI of the cervical spine which showed no disc herniation or any other significant abnormality. (Tr. at 203; Def.Ex. B–1.) Although the radiologist's report on the January 21, 1998 cervical MRI stated that there was some straightening of the cervical spine and associated mild degenerative disc disease (*id.*), Dr. Frazier testified that the radiologist's report is unreliable. (Tr. at 317–18.) He based his conclusion on the fact that the radiologist made a generalized statement apparently without any actual measurement of lordosis. (Tr. at 318.) In any event, Dr. Frazier concluded that the January 21, 1998 cervical MRI showed that Bellantoni's neck curvature was then 23 degrees, placing it within the normal range. (Tr. at 282–84; Def.Ex. III–3.)

In March 1998, Dr. Peress began the first of four cervical and three lumbar epidural steroid facet injections, *i.e.*, injections of steroids into the vertebral joints. (Tr. at 206–07.) Because neither the x-rays nor the MRIs detected any significant abnormalities in the cervical region, the

1. Dr. Peress uses the expression "possible derangement" interchangeably with the term "instability." (Tr. at 234.)

initial cervical injections had to be administered in an arbitrary region (Tr. at 203, 236), the first in the C–3/C–4 area, and all subsequent injections in the C–4/C–5 region. (Tr. at 222.)

In 1998, Dr. Peress diagnosed Bellantoni with cervicocranial syndrome, cervical and lumbar instability syndromes and cervical and lumbar radiculitis. (Tr. at 203, 205, 235; Def.Ex. B–1.) Dr. Peress admitted that these are subjective diagnoses that do not reflect any objective abnormalities, but rather is clinical evaluations and the patient's complaints. (Tr. at 216, 235–39.) The diagnosed instabilities are not apparent on any x-rays, MRIs or CT-scans. (Tr. at 232, 235–39.) However, on April 13, 1998, Dr. Peress's office notes indicate "restricted movement on forward bending to 60 degrees" and on October 19, 1998, they indicate flexion only to 70 to 80 degrees without pain. (Def.Ex.B–1.) His July 6, 1998 medical report indicates positive straight leg raises. (*Id.*)

On July 29, 1998 and October 21, 1999, Dr. Peress gave Bellantoni lumbar epidural injections at the L–5/S–1 region, located in the lower back above the pelvis. (Tr. at 240; Def.Ex. GGG–1.) Nevertheless, her chronic leg and back pain persisted. Therefore, on March 14, 2000, Dr. Peress recommended that Bellantoni undergo Intradiscal Electrothermal Therapy ("IDET"). (Tr. at 207; Def.Ex. B–2.) The IDET stabilizes unhealthy discs by modifying the molecules of protein fibers. It is an invasive out-patient procedure in which a needle is inserted into the disc and heated to 90˘Celsius. (Tr. at 214–15, 298.) Essentially, when the stretched or torn disc fibers are heated, they contract and provide more restraint, thereby alleviating

any pain in that area. (*Id.*) Generally, the patient is awake to inform the doctor whether the generated heat is too intense. (Tr. at 215.)

However, before an IDET procedure is performed the pain source must be located. (Tr. at 208.) On April 12, 2000, Dr. Peress administered a discogram. (*Id.*) This is a two-stage process in which the patient is awake, but slightly sedated. As Dr. Peress testified, the "more critical and important part of the dis[c]ogram ... [is] the pain provocation testing." (*Id.*) With a small syringe, contrast liquid is injected into the center of the discs. Dr. Peress then pressurizes both healthy and suspicious discs by pushing his thumb against the discs and assessing the patient's pain responses. Unhealthy discs will produce pain when the pressure is increased. (Tr. at 208–09.) During the second part of the procedure, CT-scans are taken of the liquid-filled discs to assess the discs' inner structures. (Tr. at 208, 210–13.)

Dr. Peress suspected that the pain source was the L–5/S–1 region. (Tr. at 209.) However, when he applied pressure against discs located at the L–3/L–4, L–4/L–5 and L–5/S–1 regions, it did not produce the expected pain response. (*Id.*) Therefore, Dr. Peress tested discs located in the upper spine, the T–12/L–1, L–1/L–2 and L–2/L–3 regions. (Tr. at 209–10.) When he pressurized the L–2 and L–3 discs, pain reportedly radiated down to Bellantoni's feet. (Tr. at 210.) Because the generated pain was similar to Bellantoni's symptoms, a concordant response, Dr. Peress concluded that the L–2/L–3 disc was the pain source. (*Id.*)[2] To the contrary, defendant's expert, Dr. Frazier, testified that pressure on the L–2/L–3 region

---

**2.** At this point in his testimony, Dr. Peress referred only to the L–1/L–2 disc as the pain source. (Tr. at 210.) However, a review of the medical records and the trial transcripts

illustrates that the L–2/L–3 regions also produced pain in even greater amount. (Def.Ex.B–2.)

does not produce pain in the feet. (Tr. at 290–91.) Instead, the nerves emanating from the L–5/S–1 and S–1/S–2 regions of the lower lumbar spine innervate the feet. (Tr. at 291.) The nerves at L–1/L–2 and L–2/L–3 innervate the groin and thighs. (*Id.*) To illustrate these relationships, Dr. Frazier provided a chart showing the discs and the loci of the pain produced by their respective derangement.

The CT-scans of the liquid-filled discs bolstered Dr. Peress's conclusion. The CT-scan showed a small white line outside the center of the L–2/L–3 disc. (Tr. at 211.) Dr. Peress testified that this outside line was significant. (Tr. at 212–13.) Thus, in his opinion, both components of the discogram showed injury to the L–2/L–3 disc (Tr. at 212), and, as a result, the IDET was administered to the L–1/L–2 and L–2/L–3 discs. (Tr. at 260; Def.Ex. B–2.) However, in June 2001, Dr. Peress administered the next lumbar epidural injection in the L–5/S–1 region. (Tr. at 240.) Dr. Peress proffered no reason why he administered this injection in the lower region instead of the L–2/L–3 region, which he had concluded to be the pain source.

Dr. Peress testified that he recommended the IDET procedure because a previous lumbar MRI showed some mild disc herniation or bulging at the L–5/S–1 region. (Tr. at 207.) Because the bulging was not causing any pressure on the nerves, removal was unnecessary. (*Id.*) Dr. Peress also testified that he suspected the L–5/S–1 disc to be the pain source because of Bellantoni's symptoms and the MRI "that showed that out of all of the lumbar dis[c]s, the only abnormality would be at the outer most dis[c]." (Tr. at 209.)

We are puzzled by this testimony. The record is devoid of any evidence that a lumbar MRI was administered prior to the April 2000 discogram and IDET proce-dures. The only lumbar MRI shown in the medical records was administered on September 22, 2000. (Tr. at 237–42; Def. Ex. EEE.) Therefore, Dr. Peress's recommendation to undergo invasive treatment was based solely on Bellantoni's subjective complaints and the epidural injections. Moreover, Bellantoni's complaints of her back were inconsistent. (Tr. at 294.) On March 1, 1999, she complained of pain when she extended, *i.e.*, leaned backward, but several weeks later, on April 26, 1999, she complained of pain when she flexed, *i.e.*, leaned forward. (Tr. at 294–96; Def. Ex. B–1.) Because the apparent pain source was alternating, Dr. Frazier concluded that the results were inconsistent and that invasive treatment should not have been recommended. (Tr. at 296.)

The September 22, 2000 lumbar MRI showed "no disc herniation, foraminal nar-rowing, or spinal stenosis." (Tr. at 239–40; Def.Exs. M, EEE.) Although it showed "[m]inimal disc bulge at the L–5/S–1" region and "[v]ery early degenerative disc disease with slight prominence of the lumbar lordosis," Dr. Peress admitted that he could not decipher whether it was an "acute tear or relaxation over time." (Tr. at 261.) Dr. Frazier also testified that the abnormality of the L–5/S–1 disc is present in 30–40% of the population below the age of 40. (Tr. at 281.) An October 4, 2000 thoracic MRI, which Dr. Peress described as a negative study, also did not indicate any possible injuries. (Tr. at 240; Def.Ex. M.)

Bellantoni presently complains of extreme pain in her neck, back, legs and beneath her feet. (Tr. at 32.) Although she testified that the accident has prevented her from performing daily activities such as dancing and bicycling and has made her "feel like an old woman" because of her decreased energy level (Tr. at 33), she also conceded that in 1987, 1989, 1991,

1992, 1995 and 1996 she had repeatedly complained of fatigue to her treating physicians. (Tr. at 55–56; Def.Ex. I–2.) Nevertheless, Bellantoni's present pain is so intense that she feels compelled to take 6 tablets of Percocet daily. (Tr. at 28, 32.) Therefore, in Dr. Peress's medical opinion, the 1997 accident caused Bellantoni to suffer a permanent limitation on the use of her neck and back. (Tr. at 219–20.) Dr. Peress testified that there are permanent derangements at the C–4/C–5, L–1/L–2 and L–2/L–3 regions (Tr. at 222–23), although he admitted that such derangements are not visible on any objective radiographic examination. (Tr. at 232.)

Moreover, no discogram was performed on the C–4/C–5 region. (Tr. at 222.) Dr. Peress's conclusion of permanent derangement in the C–4/C–5 region is based on the fact that the first cervical epidural injection facet block, which did not alleviate Bellantoni's migraines, was administered to the C–3/C–4 region, whereas all subsequent blocks, which did alleviate her pain, were administered to the C–4/C–5 region. (*Id.*) Dr. Peress also based his conclusion on the fact that 85% of his patients involved in similar motor vehicle accidents have suffered derangements in the C–4/C–5 region. (*Id.*) To the contrary, Dr. Frazier testified that the most common pain source is either the C–5/C–6 or C–6/C–7 level, located just above the thoracic spine where the neck is more likely to bend. (Tr. at 289–90.) In any event, Dr. Peress conceded that because no diagnostic tests were performed, it is possible that the pain source is not at the C–4/C–5 region, but rather the adjacent C–3/C–4 region. (Tr. at 236–37.)

Dr. Peress opined that Bellantoni will need continued medication and cervical and lumbar epidural steroid injections. (Tr. at 223.) Because the IDET procedure cannot be performed on the neck, Dr. Peress suggests discography and a single-level spine fusion in the C–4/C–5 area. (Tr. at 224.) Although he testified that Bellantoni will also require medication to alleviate the burning in her feet (*id.*), during his course of treatment Dr. Peress acknowledged that the pain in her heels did "not appear to be radicular or related to the back condition, but is due to the developmental state of pes planovalgus, (painful flat foot), plantar fasciitis." (Tr. at 250–51; Def.Ex. B–2.)

Currently, Bellantoni has full range of motion in both her back and neck. (Tr. at 244.) On February 21, 2001, Dr. Peress concluded that the IDET was successful on the L–1/L–2 and L–2/L–3 level and that other than "a pulling sensation at the L5 S1 [sic] level," Bellantoni had full flexion to her lumbar spine without pain and could extend 20 to 30 degrees without pain. (Tr. at 244–45; Bellantoni Ex. 2.) However, he could not predict how long the IDET would remain effective and opined that Bellantoni may require a spinal fusion. (Bellantoni Ex. 2.) On April 30, 2001, Dr. Peress concluded that "the IDET was in fact successful in alleviating symptoms of lumbar instability[ ]" and that "[t]he present symptoms of lumbar radiculitis maybe [sic] stemming from an additional disc not treated by the IDET which may have undergone progressive deterioration." (Bellantoni Ex. 2.) However, he concluded that repeat epidural injections should be performed at the L–5/S–1 level and if unresponsive, a discogram should be performed in that area. (*Id.*) Dr. Peress also found that Bellantoni had no "discomfort with marked pressure from the thoracolumbar junction through the lumbosacral junction other than that of my examining hands pressing on the spinous processes." (*Id.*; Tr. at 245.) Dr. Frazier testified that all of the radiographic studies are within normal limits for someone of Bellantoni's age. (Tr. at 280.)

With respect to Bellantoni's employment, she missed one week of work after the accident. She remained as a housekeeper for years subsequent to the accident, but her job responsibilities were limited. For example, while employed at the Chambord, she was not able to vacuum the larger halls, *i.e.*, the wedding hall. (Tr. at 22–26, 37; Def.Ex. R.) Furthermore, although she applied for work at the Dollar Tree as a "stock person," she was hired as a cashier and could only perform "a little [physical work] outside on the shelves." (Tr. at 40–41; Def.Ex. T–1.) Although she did not remain for a substantial period of time at any of her jobs, she did not leave because of her medical condition, but rather because of insufficient hours, disputes with coworkers and for taking unauthorized vacation time. (Tr. at 21, 24, 38, 43.)

### B. *Mastrantuono*

At the scene of the accident, Mastrantuono complained of pain in her lower back, legs and feet. (Tr. at 69.) She was taken on a stretcher and in a head collar to the emergency room where she was diagnosed with a sprain. (Tr. at 69–70.) All x-rays proved negative, but a lumbar CT-scan showed a right lateral herniated disc at the L–3/L–4 region and a disc bulge at the L–4/L–5 region. (Tr. at 70; Def.Ex. Z–1.)

Mastrantuono thereafter visited Dr. Peress. Dr. Peress had been treating Mastrantuono since 1995 for a back injury she sustained in 1982 while employed as a tuber at the Beacon Textile Printers. The 1982 injury was so severe it placed her in traction for a total of 36 days (Tr. at 71, 89; Mastrantuono Ex. 2) and rendered her permanently disabled for the purposes of Workers' Compensation. (Tr. at 62–63.) As a result of the 1982 injury, Mastrantuono underwent a laminectomy at the L–5/S–1 region in 1983, spine fusion surgery at the L–4/L–5 and L–5/S–1 regions in 1984 and a refusion at the L–4/L–5 region in 1985. (Stmt. Agreed Facts ¶ 23.) However, none of the surgeries alleviated her migraine headaches or pain in her neck, arms, lower back and legs. (Tr. at 64, 92–101.) In the two years preceding the accident, Dr. Peress diagnosed Mastrantuono with lumbar instability at the L–3/L–4 region. (Tr. at 184–85; Def.Ex. U–2.) He concluded that the fusion at the L–4/S–1 region had failed to heal. The lack of healing, or pseudoarthrosis, following the prior surgeries caused the instability at the upper region. (Tr. at 149, 184–85; Def.Ex. U–2.) Therefore, on April 24, 1996 and January 23, 1997, Dr. Peress gave Mastrantuono epidural injections in the L–3/L–4 region. (Tr. at 152, 186; Mastrantuono Ex. 2.) Prior to the 1997 accident, Dr. Peress had also recommended that Mastrantuono undergo surgery to correct her spinal deformity, but Mastrantuono refused. (Tr. at 74–75, 109, 152–53; Mastrantuono Ex. 6.)

Mastrantuono never fully recovered from her 1982 injury. (Tr. at 81.) She could not walk a city block, travel for more than one-half hour, stand for longer than five minutes or even dress herself. (Tr. at 100, 102, 325; Def.Ex. CCC–2.) Mastrantuono's injuries were also aggravated in 1995 when she hurt her back while lifting her invalid mother. (Tr. at 82.)

Mastrantuono first visited Dr. Peress after the 1997 accident on December 1, 1997. At this time, Dr. Peress diagnosed her with lumbar instability, post-traumatic cervical instability syndrome and cervicocranial syndrome. (Tr. at 72, 154–55; Mastrantuono Ex. 2.) Although his diagnoses were not based on any radiographic evidence (Tr. at 188–89), Dr. Peress again recommended an osteotomy, which would involve rebreaking and extending the existing fusion to the L–3/L–4 region, and

additional epidural injections. (Tr. at 72–73, 152–53, 157.)

On December 10, 1997, Mastrantuono underwent a cervical MRI and x-ray. The x-ray showed no evidence of a fracture. The MRI showed mild degenerative disc disease with straightening of the cervical curvature and a small disc herniation at C–6/C–7, but no spinal stenosis. (Mastrantuono Ex. 2.) A January 21, 1998 lumbar MRI showed no disc herniation or stenosis, but did show a bulging disc at the L–3/L–4 region. (*Id.*)

On April 17, 1998, to extend the L–4/S–1 fusion to the L–3/L–4 region (Tr. at 187), Mastrantuono underwent the surgery Dr. Peress had recommended prior to the accident. (Tr. at 75, 109.) Dr. Peress accessed the spine by entering through Mastrantuono's abdomen, removed the discs located at the L–3/L–4 and L–4/L–5 regions and fused the adjacent vertebrae. (Tr. at 158.) This operation results in a permanent change in the musculoskeletal system and substantial limitations, such as the inability to flex in the fused regions. (Tr. at 160–61.)

Complications involving Mastrantuono's heart precluded completion of the surgery. (Tr. at 76, 159.) However, during the surgery, Dr. Peress confirmed a pseudoarthrosis in the L–4/L–5 region. (Tr. at 159.) He testified that the pseudoarthrosis may have existed prior to the accident, but was asymptomatic. He added that the accident could have aggravated the condition. (Tr. at 159–60.)

After the surgery, Mastrantuono complained of neuralgia, with symptoms including a loss of control in her legs, the inward turn of one of her feet and the sensation of one hot leg and one cold leg. (Tr. at 78.) On July 6, 1998, Mastrantuono fell down a flight of stairs and landed on her lower back. (*Id.*; Stmt. Agreed Facts ¶ 26.) Dr. Peress testified that this fall may have loosened the titanium cages implanted in Mastrantuono's spine in the April 1998 surgery, which may now be causing her chronic leg pain. (Tr. at 189.) However, a review of Dr. Peress's expert report shows that Mastrantuono's complaints of neuralgia began in June 1998. (Tr. at 162.)

The interrupted surgery that began on April 17, 1998 was completed on September 2, 1998 "to improve [her] quality of life." (Tr. at 79–80; Mastrantuono Ex. 5.) However, Mastrantuono has continuously complained of pain in her waist, hip, back, buttocks, left leg and feet. (Tr. at 87.) Indeed, Dr. Peress's July 21, 1999 office notes reflect that the pain in the L–3/L–4 area was exacerbated by extension maneuvers, which he testified permit zero range of motion. (Tr. at 192; Def.Ex. U–1.)

Mastrantuono testified that the pain she presently experiences is more intense than that she felt prior to the 1997 accident. (Tr. at 80.) Because she cannot lift or bend, she is unable to perform daily household duties such as making the bed or washing the dishes. (Tr. at 87.) She sleeps in a fetal position, precluding her husband from sleeping in the bed with her. (*Id.*) Her left leg still turns in and buckles. (Tr. at 85.)

Dr. Peress testified that the automobile accident aggravated a pre-existing condition, requiring surgery that was not necessary prior to that time. (Tr. at 171, 193.) It is clear that Mastrantuono will need further medical treatment to alleviate her pain. Some of Dr. Peress's recommendations include the implantation of a morphine drip or revision of the lumbar fusion. (Tr. at 84, 174–76.) However, none of these options may provide Mastrantuono with the relief she is seeking. Dr. Frazier testified that a sixth operation to reposition the titanium cages would have less

than a 40% chance of success. (Tr. at 362.)

Dr. Frazier also testified that Mastrantuono complained of the same pain prior to the accident that she did after the accident. (Tr. at 332.) Although he admitted that Mastrantuono's leg pain has been exacerbated, he attributed the increased leg pain to the 1998 surgery rather than the 1997 accident. (*Id.*) Nevertheless, when asked by the Court whether he would have operated in April 1998 had he been Mastrantuono's surgeon, Dr. Frazier answered in the affirmative. (Tr. at 359–60.)

### C. *Juan Mastrantuono*

Juan Mastrantuono testified that as a result of the 1997 accident, he must perform all of the household duties such as cleaning the bathroom, vacuuming and washing the clothes and dishes. (Tr. at 114–15.) Although the Mastrantuonos' sexual relationship may have been affected by the 1982 injury and subsequent surgeries, at the current time it is non-existent. (Tr. at 115, 117–18.)

### CONCLUSIONS OF LAW

### I. *Applicable Law*

Under the FTCA, tort liability for an accident arising out of the alleged negligence of a United States employee is governed by the law of the state where the accident occurred. *See* 28 U.S.C. § 1346(b). Because the November 8, 1997 accident occurred in New York, this case is governed by New York's No–Fault Law. *See Molzof v. United States,* 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992); *Chen v. United States,* 854 F.2d 622, 625–26 (2d Cir.1988).

New York's No–Fault Law permits plaintiffs to recover in tort for any "basic economic loss" that exceeds $50,000. N.Y.Ins.Law §§ 5102(a), 5104(a). Basic economic loss includes medical expenses, lost wages and other reasonable and necessary expenses. *See id.* § 5102(a). New York's No–Fault Law also allows plaintiffs to recover for any non-economic loss, *i.e.*, pain and suffering, but only if the plaintiff sustained a "serious injury." *Id.* § 5104(a). Three categories of "serious injury" are applicable to this case: "the permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; [and] significant limitation of use of a body function or system." *Id.* § 5102(d).

■ It is well settled that to prove a permanent consequential limitation or significant limitation of use, a plaintiff must demonstrate " 'something more than . . . a minor, mild or slight limitation of use.' " *Ventra v. United States,* 121 F.Supp.2d 326, 333 (S.D.N.Y.2000) (quoting *Licari v. Elliott,* 57 N.Y.2d 230, 455 N.Y.S.2d 570, 573, 441 N.E.2d 1088 (1982)). "The significance of the limitation must be supported by credible medical evidence and must be objectively measured and quantified." *Ventra,* 121 F.Supp.2d at 333–34; *see Barth v. Harris,* No. 00 Civ. 1658, 2001 WL 736802, at *9 (S.D.N.Y. June 25, 2001). To prove a permanent loss of use of a body organ, member, function or system, a plaintiff must show a total loss of use. *See Oberly v. Bangs Ambulance, Inc.,* 96 N.Y.2d 295, 727 N.Y.S.2d 378, 379, 751 N.E.2d 457 (2001).

### II. *Bellantoni*

■ It is well settled that to establish a claim of "serious injury," a plaintiff must introduce objective and credible medical evidence of such an injury. *See Pierre v. Nanton,* 279 A.D.2d 621, 719 N.Y.S.2d 706, 707 (2d Dep't 2001) ("a plaintiff is required to provide objective evidence of the extent or degree of the alleged physical limita-

tions resulting from the injury and their duration") (citations omitted); *Rose v. Furgerson,* 281 A.D.2d 857, 721 N.Y.S.2d 873, 876 (3d Dep't 2001) ("herniated or bulging discs do not per se meet the statutory threshold of serious physical injury, absent objective evidence of the extent or degree of the alleged physical limitations resulting from the injuries and their duration") (citations omitted). Subjective complaints of pain do not suffice. *See Ventra,* at 333–34. Therefore, a diagnosis based solely on the patient's subjective expressions of pain, and a range of motion test, is insufficient to support an objective finding of serious injury. *See Barth,* 2001 WL 736802, at *9.

▪ MRIs, x-rays and CT-scans are objective and credible medical evidence of a serious injury because they do not rely on the patient's complaints of pain. *See, e.g., Palivoda v. Sluberski,* 275 A.D.2d 1036, 713 N.Y.S.2d 378, 378 (4th Dep't 2000); *Bushman v. Di Carlo,* 268 A.D.2d 920, 702 N.Y.S.2d 426, 429 (3d Dep't 2000). However, in this case, none of the lumbar x-rays, MRIs or CT-scans administered prior to the discogram showed any significant abnormalities. (Tr. at 230–33, 280; Def. Ex. B–1.) Therefore, a major issue at trial concerned whether the April 2000 discogram constituted objective medical evidence of an abnormality at the L–1/L–2 and L–2/L–3 regions. We conclude that it does.

Contrary to defendant's assertions, the above-mentioned list of acceptable objective medical evidence is not exclusive. For example, the Appellate Division, First Department has held that notwithstanding normal MRIs and CT-scans, objective evidence such as straight-leg raising tests conducted by the treating physician and observations of spasms, whereby he quantified a 30% loss of motion in the lumbosacral spine and a 30% loss of rotation, ab-

duction and extension in the cervical spine, were sufficient to withstand a summary judgment motion. *See Adetunji v. U–Haul Co. of Wis., Inc.,* 250 A.D.2d 483, 672 N.Y.S.2d 869, 870 (1st Dep't 1998). This remained true even though the findings were made two years after the accident. *See id.; see also Mangano v. Sherman,* 273 A.D.2d 836, 709 N.Y.S.2d 293, 294 (4th Dep't 2000) (holding that the plaintiff raised a triable issue of fact by submitting an affidavit of her orthopedic surgeon who concluded that she suffered permanent limitations including a 20–30% loss of flexion, rotation and extension in her neck, a 20–degree loss of full elevation of the right shoulder, permanent winging of the right scapula with permanent nerve damage and palsy to the long thoracic nerve and a 20% loss of use of the right shoulder); *Thompkins v. Santos,* No. 98 Civ. 4634, 1999 WL 1043966, at *3 (S.D.N.Y. Nov.16, 1999) (holding that a triable issue of fact existed where physician's report indicated a 20–degree loss of mobility in the lumbar spine and a 10–degree loss of mobility in the cervical spine). Courts have additionally noted the importance of passive range of motion tests, which are based on more objective criteria, *see Ventra,* 121 F.Supp.2d at 334, and EMG examinations. *See Rookwood v. Valdez,* No. 99 Civ. 10285, 2001 WL 776939, *4 (S.D.N.Y. July 11, 2001) ("[c]learly an EMG examination is an objective test"); *see also Gillick v. Knightes,* 279 A.D.2d 752, 719 N.Y.S.2d 335, 336 (3d Dep't 2001) (relying on x-rays, MRI reports, EMG and nerve conduction studies).

In this case, Dr. Frazier's testimony concerning the subjective nature of the first phase of the discogram, *i.e.,* its dependence on Bellantoni's pain responses, was persuasive. Indeed, Dr. Peress testified that the more crucial phase of the discogram was the pain provocation test. His

decision to conduct the IDET was largely based upon the results of the pain provocation test and not the CT-scans of the contrast liquid. (Tr. at 260.) Moreover, Dr. Peress, in an attempt to bolster the credibility of such a diagnostic test, testified that he must "put on an act" and "scam" the patient when conducting the IDET because he is skeptical of his patient's responses. (Tr. at 209.)

Dr. Frazier's testimony concerning the subjective nature of the administration of the discogram was also persuasive. (Tr. at 276.) For example, Dr. Peress used his thumb instead of a pressurized gauge, thereby depriving the pain provocation test of any measurable component. (*Id.*) Because the entire process is based upon applying pressure against the discs in the back, if Dr. Peress placed excessive pressure with his thumb, even a normal disc could have produced pain. (Tr. at 276–77.) Furthermore, Dr. Peress testified that he personally conducts the discography because he has the closest understanding of the patient's pain responses. (Tr. at 213.) For this reason, we agree with Dr. Frazier that to objectify this diagnostic test, it should have been conducted by another physician. (Tr. at 313–14.) Dr. Peress's personal involvement may have clouded his thinking, such that he incorrectly concluded that feet pain involves the L–1/L–2 and L–2/L–3 nerves, rather than those of the L–4/L–5 region as explained by Dr. Frazier. *See also Cruz v. United States*, No. 96 CV 2031, 1998 WL 846809, at * 4 (S.D.N.Y. Oct.15, 1998) (discussing the defendant's expert who explained that "the lower extremities, specifically the vastus medialis, tibialis interior, and the peroneals" are innervated by the L–4/L–5 nerve).

However, we cannot ignore the second phase of the discogram, CT-scans of the inner structure of the discs filled with contrast liquid. This objective evidence clearly showed an abnormality in the L–1/L–2 and L–2/L–3 regions, a fact that defendant did not adequately address at trial. Therefore, Dr. Peress's diagnosis of an abnormality in the L–1/L–2 and L–3/L–4 was not based solely on Bellantoni's pain responses. Accordingly, we find that the discogram constitutes objective medical evidence of injury and that plaintiff established that she suffered a significant limitation attributable to the L–1/L–2 and L–3/L–4 regions.[3]

Our conclusion is bolstered by the fact that Dr. Peress's 1998 office notes indicate that Bellantoni had flexion of only 60 degrees without pain and his 1999 office notes indicate flexion of only 70 to 80 degrees as well as positive straight leg raises. Furthermore, in 1999 she experienced varying pain when she flexed and extended. Although Dr. Frazier testified that Dr. Peress should not have performed an invasive procedure when a patient complains of alternating pain sources, the fact that the patient consented to such a procedure is strong evidence that there was a spinal derangement causing substantial pain.

We are cognizant of the fact that Bellantoni remained as a housekeeper for a substantial period of time after the 1997 accident. However, we find it more persuasive that she did not perform substantially all of the same employment responsibilities after the accident as she had done prior thereto. Moreover, at the present time

---

**3.** Defendant failed to address whether Bellantoni's injuries constitute a limitation of a "function" or system. In *Oberly v. Bangs Ambulance, Inc.*, 271 A.D.2d 135, 710 N.Y.S.2d 676, 680 (3d Dep't 2000), *aff'd*, 96 N.Y.2d 295, 727 N.Y.S.2d 378, 751 N.E.2d 457 (2001), the Third Department, Appellate Division held that nerve damage resulting in permanent partial loss of use of arm constitutes injury to a "member."

she works as a cashier; she merely scans and packages the bottles without heavy lifting. (Tr. at 27–28.)

■ We are also aware of Dr. Peress's April 30, 2001 medical record which states that: the IDET was successful; Bellantoni has 90 degrees of flexion and 20 to 30 degrees of extension without pain; she has no discomfort from the thoracolumbar junction through the lumbosacral junction unless Dr. Peress maximizes pressure against her spine with his hand, which is arguably subjective medical evidence; and all straight leg raises are negative and there has been no indication of muscle spasms. These factors will be considered in connection with our assessment of damages for future pain and suffering. However, they will not preclude recovery. In February 2001, Dr. Peress stated that he is unclear how long the IDET will remain effective and suggests possible spinal fusion surgery.

Although Dr. Peress was unsure as to the source of Bellantoni's pain and limitation and his treatment was inconsistent and perhaps improvident, we will not allow this to disadvantage Bellantoni. A review of the medical records illustrates that Bellantoni still feels severe pain in the L–5/S–1 region. Because she consented to invasive procedures and currently takes 6 tablets of Percocet daily, her subjective complaints of pain are fully credible. Moreover, Bellantoni does not merely suffer from a mild limitation. She can no longer engage in many physical activities or do any heavy lifting. This evidence, combined with the September 22, 2000 MRI which showed a small disc bulge at the L–5/S–1 region not common within 60–70% of the people within Bellantoni's age group and reports of positive straight leg raises, are sufficient to establish a significant limitation. *See Larrabee v. State of New York,* 216 A.D.2d 772, 628 N.Y.S.2d 447, 448 (3d Dep't 1995) (holding that the observance of spasms and trigger necessitated the conclusion that "the evidence of claimant's injuries did not consist exclusively of subjective complaints and symptomatology without a diagnosis based upon a ˙medical foundation") (citations omitted).

■ We also find that plaintiff has proven beyond a preponderance of the evidence that the 1997 accident caused these above-mentioned injuries. *See Dubois v. Simpson,* 182 A.D.2d 993, 582 N.Y.S.2d 561, 563 (3d Dep't 1992). Causation or aggravation of pre-existing injuries must be established by objective medical evidence. *See Senno v. Picture Cars E., Inc.,* 275 A.D.2d 315, 712 N.Y.S.2d 52, 53 (2d Dep't 2000) (upholding jury verdict for defendant because "[t]here was evidence that the appellant's injuries resulted from a degenerative condition and a prior automobile accident, and were not caused or exacerbated by the accident at issue in this case."). For example, in *Andre v. Seem,* 234 A.D.2d 325, 650 N.Y.S.2d 794 (2d Dep't 1996), the Appellate Division, Second Department held that where the plaintiff's medical expert cannot rule out the possibility that the injury had occurred before the accident, it is simply "sheer speculation" to conclude that the injury had been caused by that accident. *Id.* at 795; *Ekundayo v. GHI Auto Leasing Corp.,* 273 A.D.2d 346, 709 N.Y.S.2d 603, 604 (2d Dep't 2000). Similarly, in *Crandall v. Sledziewski,* 260 A.D.2d 754, 687 N.Y.S.2d 812 (3d Dep't 1999), the plaintiff had been diagnosed with spondylolisthesis (a forward slippage of one vertebra relative to another) two years before he was involved in a car accident. *See id.* at 812–13. The objective radiographic evidence taken after the accident was no different than that taken prior to the accident. *See id.* at 813. However, because of the plaintiff's " 'sudden increase

in the onset of low back pain' as a result of the accident, and the pain that he had after the accident, which 'according to plaintiff was a lot worse than he ever had before,'" the physician performed posterior spinal fusion surgery. *Id.* The Appellate Division, Third Department reversed the trial court's denial of the defendant's motion for a directed verdict, holding that the plaintiff failed to sustain his burden of proof because there was no objective evidence to establish the exacerbation of pre-existing injuries. The court held that the physician's reliance on the plaintiff's complaints of pain were insufficient to withstand a directed verdict. *See id.* at 814.

However, in this case, it would not be "sheer speculation" to conclude that Bellantoni's injuries were caused by the 1997 accident. Regarding the L–1/L–2 and L–2/L–3 injury, Dr. Peress testified an injury to this region is unusual "in the course of normal activity, wear and tear of life." (Tr. at 212.) Furthermore, the medical reports indicate that Bellantoni was complaining of pain in the L–5/S–1 region immediately after the accident, which is why Dr. Peress likely suspected it to be the pain source. Albeit Dr. Peress could not determine from the MRI whether the disc bulge at L–5/S–1 was an acute tear or relaxation over time. However, as he further explained, this concession was a result of merely observing the disc's structure as presented by the MRI. Therefore, when viewed in the light of Bellantoni's complaints, there is sufficient evidence to conclude that the disc bulge was not a mere relaxation over time, but a tear. Finally, there has been no objective medical evidence that Bellantoni had similar abnormalities prior to the 1997 accident. Therefore, we find that Bellantoni has proven causation by a preponderance of the evidence.

## A. *Damages*

■ The only injuries for which Bellantoni may recover damages are pain and suffering. She did not submit any documentary proof that her basic economic loss exceeded $50,0000. She has not paid for any medical treatment to date (Tr. at 48) and she proffered no evidence as to what future medical treatment could cost. Bellantoni has not even attempted to approximate her past lost wages and this Court will not engage in such speculation based upon her intermittent employment history and fluctuating wages. *See Cardella v. Henke Mach., Inc.,* 283 A.D.2d 894, 726 N.Y.S.2d 734, 739–40 (3d Dep't 2001) (disallowing claim for past medical expenses where "record contain[ed] no billings or other proof indicating what services comprise" amount parties had stipulated to).

Moreover, we reject the report prepared by plaintiff's economist, Andrew Weintraub, Ph.D., regarding her claim for future lost wages. Weintraub was not given Bellantoni's W–2 forms for the years 1998, 1999, and 2000, but instead had to estimate her annual earnings by averaging her 1995 to 1997 annual income. (Tr. at 134–35.) Dr. Weintraub admitted that this rendered his report incomplete. (*Id.*) Additionally, Dr. Weintraub unaccountably assumed that Bellantoni's future wages would grow at a rate of 4%, and used the same 4% rate in discounting the future wage loss to present value, as if the interest rate would ever be as low as the rate of inflation. Because we reject this report, we find that plaintiff has failed to prove her future loss of wages by a preponderance of the evidence.

■ When determining the appropriate damages for pain and suffering, we are bound by a standard of reasonableness. *See Battista v. United States,* 889 F.Supp. 716, 727 (S.D.N.Y.1995). For lumbar and cervical sprains and strains,

New York juries have awarded plaintiffs amounts in the range of $15,000, *see, e.g., McGowan v. Sterman,* No. 000579/96, 1999 WL 1132741, at *1 (Sup.Ct. Rockland County 1999), to $30,000, *see, e.g., Fidelo v.C.S. Goodfriend & Co., Inc.,* No. 142/86, 20XX WL 721046, at *1 (Sup.Ct. Westchester County 2000). However, for claims of lumbar and cervical radiculitis and instability, juries have awarded damages in the amount of $125,000, *see, e.g., Rice v. Oberlander,* No. 94–01691, at *1 (Sup.Ct. Suffolk County 1997), $150,000, *see, e.g., Ward v. Spencer,* No. 92/2276, 1996 WL 796084, at *1 (Sup.Ct. Ulster County 1996), and even $250,000, *see, e.g., Espinal v. Jaber,* No. 152 TSN 19, 1995 WL 536780, at *1 (Sup.Ct.N.Y. County 1995). We conclude that Bellantoni has suffered more than a mere sprain as evidenced by her physical complaints of pain, her decision to undergo the IDET procedure and epidural injections and Dr. Peress's objective findings which include, *inter alia,* reports of positive straight leg raises on the right side. In light of the awards given by juries for lumbar instability, it is well within reason to award Bellantoni $100,000 for her past and future pain and suffering attributable to injuries sustained in the 1997 accident.

### III. *Mastrantuono*

█ It is clear that Mastrantuono incurred a permanent limitation in the use of her back and neck. Her left foot turns inward and even sitting is painful. Her injuries are also evidenced by objective medical criteria. The December 10, 1997 cervical MRI showed a small disc herniation at the C–6/C–7 region, and the January 1, 1998 MRI showed small disc bulging at the L–3/L–4 region. During surgery, Dr. Peress diagnosed pseudoarthrosis in the L–5/S–1 region, which he concluded could have been causing Mastrantuono's pain. Although the manner in which Dr.

Peress diagnosed the pseudoarthrosis, *i.e.,* by approaching through the abdomen to view the frontal aspect of the spine, is not ideal (Tr. at 327), it is of evidentiary value.

Therefore, the critical issue in Mastrantuono's case is whether the 1997 accident caused her injury or aggravated her prior injuries. Prior to the accident, Mastrantuono complained of the same symptoms she complained of after the accident. Dr. Peress diagnosed her as having pseudoarthrosis in the L–5/S–1 region following three prior back surgeries, whereas after the 1997 accident Dr. Peress testified that she had developed pseudoarthrosis as a result of the accident.

As in *Crandall,* it is obvious here that the objective evidence of Mastrantuono's injury is similar to that obtained prior to the accident. However, this case is distinguishable from *Crandall.* Dr. Peress testified that if the pseudoarthrosis existed prior to the accident, it was asymptomatic and was rendered symptomatic by the accident. This is evidenced by Mastrantuono's response to the pain. For 2 years prior to the accident, she persistently refused to undergo further back surgery. But, in April 1998, she finally agreed to undergo similar surgery to alleviate her pain. Moreover, it must be emphasized that the April 1998 surgery was not completed because of Mastrantuono's weak heart. Nonetheless, in the face of obvious health risks, she opted to undergo the surgery in September 1998, which persuasively evidences her increased pain following the accident.

The exacerbation or causation of Mastrantuono's injuries is also evidenced by her increased physical limitations subsequent to the accident. For example, at the present time, she sleeps in a fetal position, she cannot bend forward and therefore cannot perform any daily household duties,

and has trouble walking or climbing the stairs. Even Dr. Frazier admitted that Mastrantuono's leg pain did not arise until after the accident. Finally, in none of the cases cited by defendant did the defendant's expert witness testify that he would have recommended that the plaintiff undergo surgery. In this case, Dr. Frazier stated that he would have recommended surgery to Mastrantuono in April 1998. The colloquy with the Court was as follows:

> THE COURT: Let me ask you this: Knowing what you know of Donna Mastrantuono's condition as of April 1998, would you have operated, if you had been her surgeon, at that time?
>
> THE WITNESS: I would have given her the option of surgery, but would have made it very clear that the success rate is very small, yes.
>
> THE COURT: In other words, would you have told her that she had a chance to get better if she took the operation?
>
> THE WITNESS: Yes. But I would— yes.

(Tr. at 359–60.)

Accordingly, we find that Mastrantuono sustained a permanent limitation in the use of her back as a result of the 1997 accident.

### A. *Damages*

▮▮▮ Similar to Bellantoni, the only injuries for which Mastrantuono may recover are for pain and suffering because she proffered no documentary evidence that would prove she sustained greater than $50,000 in basic economic loss. Because of the seriousness of Mastrantuono's injuries, the excruciating pain she must have felt during two surgeries and the possibility that any future medical treatment may never alleviate her pain, it is within reason to enter judgment in favor of Mastrantuo-

no in the amount of $150,000. In arriving at this figure, we have considered the fact that Mastrantuono complained of similar symptoms and limitations prior to the accident.

### IV. *Juan Mastrantuono*

▮▮▮ Because we find that Juan Mastrantuono has been required to perform all of the household chores and cannot engage in any sexual relations with his wife, he is hereby awarded $50,000 for loss of services. *Cf. Espinal,* 1995 WL 536780, at *1 (1995 jury award of $27,500 for loss of services).

### CONCLUSION

For the aforementioned reasons, judgment will be entered in favor of Samantha Bellantoni in the amount of $100,000, in favor of Donna Mastrantuono in the amount of $150,000 and in favor of Juan Mastrantuono in the amount of $50,000. **SO ORDERED.**