**Francisca HODDER and Peter Hodder, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 01 CV 8086(CLP).**

United States District Court, E.D. New York.

April 29, 2004.

Harold Chetrick, New York, NY, for Plaintiffs.

Elliot M. Schachner, United States Attorney's Office, Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

POLLAK, United States Magistrate Judge.

On November 29, 2001, plaintiffs Francisca Hodder and Peter Hodder commenced this action, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1291, 1346(b), 1402, 2401, 2402, 2671–2680, for injuries sustained when the vehicle driven by Ms. Hodder struck the vehicle driven by a United States Postal Inspector who was acting within the course of his employment at the time of the accident.

On February 4, 2003, the parties consented to trial before the undersigned. Based on the evidence presented at trial, this Court makes the following findings of fact and conclusions of law.

### FACTUAL FINDINGS

On April 17, 2001, at approximately 11:20 a.m., Francisca Hodder, 53 years of age, was driving home on Fourth Avenue in Brooklyn from her job as a nutrition consultant with the New York City Department of the Aging. (Tr. at 2, 4, 9).[1]

---

1. Citations to "Tr. at ___." refer to the transcript of the trial proceedings before this Court on September 15, 2003.

It was a bright sunny day and the roadways were dry. (*Id.* at 9, 350).

According to the testimony, Fourth Avenue consists of two lanes of traffic in both directions and a parking lane on each side of the avenue. (*Id.* at 10). As Ms. Hodder was proceeding southbound on Fourth Avenue heading towards the Third Street intersection, she was proceeding in the far left lane with no cars in front of her vehicle. (*Id.*) Ms. Hodder testified that as she approached the intersection, she noticed that the traffic signal in her direction was green. (*Id.* at 11). At this point, she was approximately six car lengths from the intersection. (*Id.*) She testified that as she was proceeding into the intersection, traveling at approximately 30 miles per hour, she saw another vehicle, a minivan, coming from her right, approximately two car lengths away, traveling at a speed of approximately 40 miles per hour. (*Id.* at 11–12). She testified that by the time she could apply the brakes, the minivan was already in the intersection. (*Id.* at 13). She applied her brakes hard, striking the driver's side of the minivan with the front of her vehicle. (*Id.*)

Although she was wearing her seatbelt, the impact caused her to strike her chest against the steering wheel, and her head and neck snapped backwards. (*Id.*) She testified that she was "unconscious" for approximately "ten minutes." (*Id.* at 14).

At some point thereafter, the police from the 78th Precinct arrived and Ms. Hodder told them that the other driver ran the red light and that she was dizzy. (*Id.*) She claims that she was placed on a long board by the emergency service technicians and taken by ambulance to New York Methodist Hospital, where an EKG was performed and x-rays were taken of her neck and shoulder. (*Id.* at 15–16).

The defendant's witnesses' version of events differed somewhat from that of Ms. Hodder. Thomas Kelly, who was a United States Postal Inspector at the time of the accident,[2] testified that on April 17, 2001, he was part of a team of criminal investigators assigned to conduct surveillance of another Postal Service employee. (*Id.* at 266, 277, 316). This other employee, who was allegedly injured on the job and was receiving disability benefits from the Postal Service, was believed to be faking or exaggerating his injuries. (*Id.* at 266, 281, 316). It was believed that not only was he employed at another job, but he was suspected of performing physical activity beyond his claimed limits, in violation of 18 U.S.C. § 1920. (*Id.* at 266–67, 316).

On the day of the accident, the team, which consisted of Inspector Kelly, Inspector Albert Patton, Robert Benson, and Michael Riccuito, was attempting to determine the activities of this individual when he was away from his home. (*Id.* at 266, 316–17, 324–25). Thus, the goal of the investigating team that day was to conduct surveillance on this individual, to follow him to see where he went and what he did during the hours he was away from home. (*Id.* at 316–17, 327). If the individual was observed committing a felony in their presence, the inspectors were authorized to arrest him. Both Kelly and Patton testified that they were authorized to carry a weapon and handcuffs and to effect arrests for felonies committed in their presence. (*Id.* at 268, 315–16).

On the morning of the accident, the team had begun their surveillance at the suspect's home and at approximately 11:15 a.m., they were in the process of following the suspect's vehicle as it proceeded east on Third Street. (*Id.* at 318). According to Patton, the case agent on the investiga-

---

**2.** According to Mr. Kelly, he was employed as a Postal Inspector for 25 years from 1977 to 2002, at which time he became employed as a fraud investigator for Citigroup. (*Id.* at 263).

tion, each of the members of the team was in his own unmarked vehicle equipped with emergency lights and sirens. (*Id.* at 318–19). Kelly, who was driving a green Ford Explorer, was in the first vehicle directly behind the suspect; directly behind Kelly was Patton in a maroon Chrysler van, followed by Benson in a green Chrysler van and Riccuito in a white Dodge van. (*Id.* at 332).

According to Kelly, he was approximately a block or more behind the subject's car when the subject cleared the intersection of Fourth Avenue and Third Street. By the time Kelly reached the intersection, the light was red. (*Id.* at 286). The subject vehicle was approaching Sixth Avenue at this point, and Kelly was beginning to lose sight of the car. (*Id.* at 285, 320). Kelly testified that he stopped his car at the red light, turned on his lights and siren, and looked to his left. (*Id.*) When he saw that the right and center lanes of traffic had stopped, he "crept" through the intersection, traveling at no more than five miles per hour. (*Id.* at 273).

Inspector Patton, who was one car length directly behind Kelly, confirmed that when Kelly reached the intersection, he came to a full stop as did Patton. (*Id.* at 334, 336). They both put on their lights and sirens and waited approximately 30 seconds for the traffic already in the intersection to clear and for the traffic in both directions on Fourth Avenue to stop. (*Id.* at 320, 322). Patton testified that after observing that the vehicles in the southbound and northbound lanes had stopped, they both proceeded into the intersection at 5 to 10 miles per hour. (*Id.* at 320, 345, 348). As Kelly proceeded approximately one to one and a half lanes into the intersection, he was struck on the driver's side by Ms. Hodder's vehicle. (*Id.* at 348, 352). Inspector Patton estimated that Ms. Hodder was traveling at a rate of 30 miles per hour and hers was the only car that passed

through the intersection after all the other traffic had cleared. (*Id.* at 350).

After the accident, Kelly pulled his car to the curb on the other side of the intersection while Inspector Patton pulled his vehicle over to the right side of the road and walked over to Ms. Hodder's Nissan. (*Id.* at 291, 353–54). Patton spoke to Ms. Hodder and asked her if she needed medical attention. (*Id.* at 355). The first time he asked, she did not respond. (*Id.*) The second time he asked, she responded, "Okay," which Patton understood to mean she was not hurt. (*Id.* at 355–56). Then she said, "the light was green." (*Id.* at 355). Patton then suggested that she pull her car out of the way and asked her if she wanted one of them to do it for her. (*Id.* at 373). She declined his offer and proceeded to pull her car to the curb. (*Id.*) Patton then stayed by her vehicle until the ambulance and the police arrived, which was approximately fifteen minutes later. (*Id.* at 362).

Inspector Patton testified that while waiting for the police to arrive, Ms. Hodder spoke to a mechanic from a nearby garage who was talking to her about repairs to her car. (*Id.* at 363). She also told Patton that she was going to call her son on her cell phone. (*Id.*) Although Patton indicated in his report that she had called her son, he testified that he did not actually see her use her cell phone. (*Id.* at 373–75). Nor could he recall anyone else approaching her car. (*Id.* at 363). Neither he or Kelly ever observed Ms. Hodder to be unconscious. (*Id.* at 275, 323). Moreover, contrary to her claim that she had to be carried to the ambulance on a back board, both Kelly and Patton, whose testimony this Court credits, testified that Ms. Hodder walked to the ambulance. (*Id.* at 293, 364). The following day, Ms. Hodder called Kelly to find out who Frank Randazzo was. (*Id.* at 297). Kelly testi-

fied that "Frank Randazzo," which was the name of the alleged owner of Kelly's Postal Service car, was a fictitious name. (*Id.*)

According to both Kelly and Patton, they did not resume surveillance of the suspected Postal Service employee that day because by the time the accident had occurred, the suspect's vehicle had long since disappeared. (*Id.* at 298, 367). When asked why he or the other members of the team did not proceed to follow the suspect after Kelly's vehicle was hit, Inspector Patton testified that his first priority was to see that everyone was all right. (*Id.* at 367). He testified, however, that the investigation into the Postal Service employee continued and on a subsequent occasion, surveillance was resumed. (*Id.* at 371–73).

*DISCUSSION*

1) *Standards*

 Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), tort liability for an accident based on the alleged negligence of an employee of the United States is governed by the laws of the state where the accident occurred— in this case, New York. *See Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Grant v. United States,* 271 F.2d 651, 654 (2d Cir.1959). Under New York law, the plaintiff must establish three elements in order to prevail on a negligence claim: (1) that defendant owed plaintiff a duty of care; (2) that defendant breached that duty; and (3) that the breach was the proximate cause of plaintiffs' injuries. *See Gardner v. United States,* 896 F.Supp. 89, 92 (N.D.N.Y.1995).

 Under New York's Vehicle and Traffic Law, it is the duty of both drivers to operate their automobiles with reasonable care, taking into account the actual and potential dangers existing from weather, road, traffic and other conditions. *See generally, Baker v. Close,* 204 N.Y. 92, 97

N.E. 501 (1912); *Oberman v. Alexander's Rent–A–Car,* 56 A.D.2d 814, 392 N.Y.S.2d 662 (1st Dep't 1977). Both drivers are under a duty: (1) to maintain a reasonably safe rate of speed, *see Hartstein v. United States Trucking Corp.,* 260 App. Div. 643, 23 N.Y.S.2d 251 (1st Dep't 1940); (2) to have their automobiles under reasonable control, *see Cromwell v. Rodriguez,* 66 Misc.2d 243, 319 N.Y.S.2d 1014 (N.Y.City Ct.1971); (3) to keep a proper lookout, under the circumstances then existing, to see and be aware of what was in their view, *see Baker v. Close,* 204 N.Y. 92, 97 N.E. 501; and (4) to use reasonable care to avoid an accident. *See id.; Oberman v. Alexander's Rent–A–Car,* 56 A.D.2d at 815, 392 N.Y.S.2d at 663. Section 1111(d) of the New York State Vehicle and Traffic Law requires traffic "facing a steady circular red signal ... [to] stop ... and ... remain standing until an indication to proceed is shown." VTL § 1111(d).

Section 1104 of the Vehicle and Traffic Law sets forth certain "privileges" that apply to drivers of authorized emergency vehicles when involved in an emergency operation. VTL § 1104(a). Specifically, the law provides:

(b) The driver of an authorized emergency vehicle may:

1. Stop, stand or park irrespective of the provisions of this title;

2. Proceed past a steady red signal, a flashing red signal, or a stop sign, but only after slowing down as may be necessary for safe operation;

3. Exceed the maximum speed limits so long as he does not endanger life or property;

4. Disregard regulations governing directions of movement or turning in specified directions.

VTL § 1104(b). The section applies to "emergency vehicles" which is defined in Section 101 of the Vehicle and Traffic law

to include, among others, "[e]very ambulance, police vehicle, fire vehicles ...." The law conditions the exemption as it applies to authorized emergency vehicles other than "police vehicles" on the use of "audible signals" and "lighted lamps" including "at least one red light [which] will be displayed and visible." VTL § 1104(c). The law further states that these provisions "shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others." VTL § 1104(c).

The New York Court of Appeals has made it clear that Section 1104(c) "precludes the imposition of liability for otherwise privileged conduct except where the conduct rises to the level of recklessness." *Saarinen v. Kerr,* 84 N.Y.2d 494, 497, 644 N.E.2d 988, 989, 620 N.Y.S.2d 297, 298 (1994). This privilege recognizes the "primary obligation to respond quickly to preserve life and property and to enforce the criminal laws." (*Id.*) Thus, a driver of an "emergency vehicle," engaged in an "emergency operation" has "a qualified privilege to proceed past a red light, and could only be held responsible for the accident if [his] conduct demonstrated a reckless disregard for the safety of others." *Mulholland v. Nabisco, Inc.,* 264 A.D.2d 411, 412, 693 N.Y.S.2d 242, 243 (2d Dep't 1999). The Court of Appeals in *Saarinen* recognized that the duties of "police officers and other emergency personnel often bring them into conflict with the rules and laws that are intended to regulate citizens' daily lives," and that they "must routinely make conscious choices that will necessarily escalate the over-all risk to the public at large in the service of an immediate, specific law enforcement or public safety goal." *Saarinen v. Kerr,* 84 N.Y.2d at 502, 644 N.E.2d at 992, 620 N.Y.S.2d at 301.

## 2) *Application—Negligence and Duty*

In this case, plaintiffs contend that the driver of the Postal Service vehicle was negligent in that he entered into the intersection and proceeded across several lanes of traffic despite the fact that the traffic signal in his direction was red, in clear violation of Section 1111(d) of the Vehicle and Traffic Law. Plaintiffs cite the police report code sheet which indicates that Kelly disregarded the traffic control signal. (Pls.' Exs. 5, 6).

Defendant contends that the government vehicle driven by a United States Postal Inspector was an undercover law enforcement vehicle that falls within the definition of a "police vehicle" which was engaged in an "emergency operation" at the time of this accident and is thus exempt from liability under Section 1104. Defendant further contends that since there is no evidence to suggest that the inspector was driving in a manner that evidenced "reckless disregard" for the safety of others, that the Postal Service cannot be held liable for this accident.

### a. *"Police Vehicle"*

The first issue to be determined is whether the Postal Service's undercover vehicle qualifies as a "police vehicle" under New York law. Clearly, United States Postal Inspectors are law enforcement officers specifically tasked with investigating criminal activity as it affects the passage of Postal Service mail and the operations of the Postal Service generally. (Tr. at 264). *See Fraternal Order of Police v. United States Postal Service,* 988 F.Supp. 701, 703 (S.D.N.Y.1997) (noting that "postal Inspectors [ ] are the primary law enforcement agents of the postal service"); *see also Cosme v. Henderson,* 287 F.3d 152, 156 (2d Cir.2002); *United States v. Ullah,* No. 02 CR 899, 2003 WL 1396300, *7, 2003 U.S. Dist. LEXIS 4166, at *20 (S.D.N.Y. March

20, 2003); *United States v. Martinez,* 869 F.Supp. 202, 203 (S.D.N.Y.1994); *United States v. Hernandez,* No. 89 CV 115, 1989 WL 120349, *1, 1989 U.S. Dist. LEXIS 11477, at *2 (S.D.N.Y. Sept. 29, 1989). As former Inspector Kelly testified, Postal Inspectors are authorized to carry weapons and handcuffs and to make arrests for violations of law committed in their presence. (Tr. at 264–65). Indeed, numerous cases have authorized the issuance of search warrants based on the affidavits of postal inspectors, *see, e.g., United States Postal Service v. C.E.C. Services,* 869 F.2d 184 (2d Cir.1989); have upheld warrantless searches conducted by Postal Inspectors investigating the possible shipment of narcotics through the mails, *see, e.g., United States v. Martinez,* 869 F.Supp. 202; and have approved the detention of mail by a postal inspector for a reasonable period of time to conduct a criminal investigation when there was reason to believe that a package contained contraband. *See, e.g., United States v. Dennis,* 115 F.3d 524 (7th Cir.1997). Postal Inspectors are also authorized to conduct investigations into activities of Postal Service employees, including the preparation of test letters with electronic beepers, *see, e.g., United States v. Dowdy,* 688 F.Supp. 1477 (D.Colo.1988), and by conducting searches of employees' lockers. *See, e.g., American Postal Workers Union, Columbus Area Local AFL–CIO v. U.S. Postal Service,* 871 F.2d 556 (6th Cir.1989).

Plaintiff argues, however, that Mr. Kelly conceded that he was not driving an ambulance, fire vehicle, civil defense vehicle or police vehicle (Tr. at 277–78),[3] and thus, he cannot claim the benefit of the exemption from liability. Moreover, plaintiff points to the absence of a specific mention of postal inspector vehicles in Section 132–a

of the Vehicle and Traffic Law, which contains the definition of "police vehicle" for purposes of the exemption of Section 1104.

The term "police vehicle" is defined in Section 132–a of the Vehicle and Traffic law as follows:

> Every vehicle owned by the state, a public authority, a county, town, city or village, and operated by the police department or law enforcement agency of such governmental unit or by a constable or police constable of a town when acting pursuant to his special duties. Any other vehicle operated by a chief or deputy or assistant chief of a police department, a sheriff, undersheriff or regular deputy sheriff, and a vehicle owned and operated by the law enforcement unit of a public or private corporation authorized by law to maintain a unit for the enforcement of law on the property of such corporation shall be a police vehicle only for the purposes of section one hundred one of this chapter.

Although the statute is silent as to Postal Inspection Service vehicles, and, in fact, makes no specific reference to any federal law enforcement agency vehicle, the Vehicle and Traffic Law defines "Police officer" to include designated "peace officers," which include Postal Inspectors. Specifically, Section 132 of the Vehicle and Traffic Law defines "Police officer" to include "every duly designated peace officer," as defined in the Criminal Procedure Law. Section 2.15 of the Criminal Procedure Law, entitled "Federal law enforcement officers; powers," grants to certain designated federal law enforcement officers special powers to enforce New York law, as distinguished from federal law, *see* CPL § 2.20, and to extend their authority beyond the boundaries of federal property.

---

**3.** The issue of whether a vehicle driven by a United States Postal Inspector falls with the purview of Section 132–a is a question of law for the Court to decide and Mr. Kelly's testimony in this regard is not binding on the Court or the government.

*See* CPL § 2.15 Practice Commentaries. Among the Federal law enforcement officers granted these special police powers are FBI Agents, DEA agents, Customs and Secret Service agents, *see* CPL § 2.15(2), (5), (7), and "United States Postal Service police officers and inspectors." CPL § 2.15(6).

Clearly, under both federal law and state law, Postal Inspectors are recognized as law enforcement officers, charged with enforcing federal laws relating to the mails, and explicitly imbued by statute, with special police powers to enforce New York State law. Moreover, the definition of "police vehicle" set forth in Section 132–a specifically refers to "[e]very vehicle ... operated by the ... law enforcement agency of such governmental unit." VTL § 132–a. While the federal government is not mentioned directly in this section, it strains credulity to imagine that an FBI or DEA agent in pursuit of a major narcotics trafficker fleeing from the scene of a drug-related homicide must stop at every intersection while a vehicle "operated by the law enforcement unit of a ... private corporation" is exempt because it is specifically referenced in the statute.

Under these circumstances, reading the Vehicle and Traffic Law provisions in conjunction with the Criminal Procedure Law, this Court finds that Postal Inspectors are "police officers" as defined by state law, CPL § 2.15(6); their vehicles, when operated in furtherance of their law enforcement duties, are "police vehicles" under VTL § 132–a; and therefore, they are subject to the exemption of Section 1104.

### b. *"Reckless Disregard of the Safety of Others"*

■ The other issue that this Court must decide is whether the inspector's conduct could be considered in "reckless disregard of the safety of others." *Saarinen v. Kerr,* 84 N.Y.2d at 501, 644 N.E.2d at 991, 620 N.Y.S.2d at 300 (holding that the standard "reckless disregard for the safety of others" requires more than "a showing of 'due care under the circumstances'—the showing typically associated with ordinary negligence claims"); *see also Szczerbiak v. Pilat,* 90 N.Y.2d 553, 686 N.E.2d 1346, 664 N.Y.S.2d 252 (1997). In *Gervasi v. Peay,* the court articulated the requirement that a claimant must show that " 'the action was *intentionally* done as an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow' and has done so *with conscious* indifference to the outcome." 254 A.D.2d 172, 173, 679 N.Y.S.2d 45, 46 (1st Dep't 1998) (quoting *Saarinen v. Kerr,* 84 N.Y.2d at 501, 644 N.E.2d at 991, 620 N.Y.S.2d at 300). Under this stringent standard, "[a] momentary lapse of judgment," such as failing to come to a complete stop at a stop sign, *see Salzano v. Korba,* 296 A.D.2d 393, 745 N.Y.S.2d 56 (2d Dep't 2002), or glancing down from the road to activate the emergency lights, *see Szczerbiak v. Pilat,* 90 N.Y.2d 553, 686 N.E.2d 1346, 664 N.Y.S.2d 252, has been held "insufficient to establish 'the level of recklessness required of the driver of an emergency vehicle in order for liability to attach.' " *Salzano v. Korba,* 296 A.D.2d at 394, 745 N.Y.S.2d at 58 (quoting *Szczerbiak v. Pilat,* 90 N.Y.2d 553, 664 N.Y.S.2d 252, 686 N.E.2d 1346).

Plaintiffs also contend that because the Postal Service knew the home address and phone number of the individual under surveillance, there was no need for the inspectors to follow the suspect through the red signal. Plaintiffs argue that based on the nature of the surveillance, the government should not be held to be exempt from liability in this case because they were not engaged in an "emergency" operation and thus, should have stopped at the intersection. Plaintiffs argue that the inspector's

conduct, in proceeding into the intersection against the traffic signal, was not only unnecessary because there was no emergency, but in reckless disregard of the safety of others.

The Court does not agree.

Based on the credible testimony at trial and this Court's analysis of the relevant statutory authorities, I conclude that at the time of the accident, Postal Inspector Kelly was acting in his capacity as a law enforcement official, on surveillance, in pursuit of a subject, and that while he proceeded against a red traffic light, he had his lights and sirens activated and he proceeded cautiously and not in "reckless disregard" of the safety of others. As a result, this Court finds that he is exempt from liability under Vehicle and Traffic Law § 1104. The nature of the criminal investigation or the fact that the inspectors had certain information about the suspect that could allow them to continue the investigation in the future does not alter the Court's analysis in any way. As law enforcement officers engaged in a criminal investigation, they were following a suspect in the belief that he would lead them to evidence of criminal activity. Under these circumstances, this Court does not find Inspector Kelly's decision to follow the suspect through the intersection, after engaging his lights and sirens, to be either unreasonable or in disregard of the safety of others. *See Criscione v. City of New York*, 97 N.Y.2d 152, 156–57, 762 N.E.2d 342, 344, 736 N.Y.S.2d 656, 658 (2001); *Saarinen v. Kerr*, 84 N.Y.2d at 501–02, 644 N.E.2d at 991–92, 620 N.Y.S.2d at 298; *Abood v. Hospital Ambulance Service, Inc.*, 30 N.Y.2d 295, 298–99, 283 N.E.2d 754, 756–57, 332 N.Y.S.2d 877, 880 (1972).

### 3) *Serious Injury Threshold*

Even if plaintiffs were to establish that the Postal Inspector's vehicle was not an emergency vehicle or that his conduct was reckless, plaintiffs cannot establish that Ms. Hodder suffered "serious injuries" as defined under New York Insurance Law § 5102(d).

### a. *Admissibility of the Chiropractor's Testimony*

■ As an initial matter, defendant argues that the Court should not consider the testimony of plaintiff's chiropractor because a chiropractor's testimony is not admissible to show serious injury. (Tr. at 56).

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. The text of Rule 702 makes it clear that there are two prerequisites that must be met before the testimony of an expert witness can be admitted into evidence. First, the trial court must ensure that the witness is properly qualified as an expert to testify on matters that are scientific, technical, or specialized in nature, *see Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir.1997); and second, the trial court must determine that the expert's testimony will assist the trier of fact in understanding the evidence or determining an issue of fact. *See Campbell v. Metropolitan Property & Cas. Ins. Co.*, 239 F.3d 179, 184–85 (2d Cir.2001) (noting that determining whether expert testimony will assist the factfinder " 'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology

properly can be applied to the facts in issue'") (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *United States v. One Parcel of Property 31–33 York Street,* 930 F.2d 139, 141 (2d Cir. 1991) (excluding expert testimony that would only complicate, not assist, the jury's decision on "a simple question for which the jury needed no help").

■ In short, the trial court functions in the capacity of a "gatekeeper" and must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. at 597, 113 S.Ct. 2786; *see also Zuchowicz v. U.S.,* 140 F.3d 381 (2d Cir.1998); *Borgognone v. Trump Plaza,* No. 98 CV 6139, 2000 WL 341135, at *3 (E.D.N.Y. Mar.9, 2000); *Textron, Inc. v. Barber–Colman Co.,* 903 F.Supp. 1546, 1552 (W.D.N.C.1995). The question of the admissibility of expert testimony is for the trial judge to resolve and the court has "broad discretion" in making that determination. *U.S. v. Feliciano,* 223 F.3d 102, 120 (2d Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1405, 1406, 149 L.Ed.2d 348 (2001); *Palazzetti Import/Export, Inc. v. Morson,* No. 98 CV 722, 2001 WL 793322, at *2 (S.D.N.Y. July 13, 2001).

In *Daubert,* the Supreme Court held that under Rule 702, the trial court must perform a "gatekeeping" function in reviewing proposed expert testimony to "ensure that any and all scientific testimony ... is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. The Court outlined four basic factors that the trial judge may consider:

Whether a "theory or technique ... can be (and has been) tested;"

Whether it "has been subjected to peer review and publication;"

Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are

"standards controlling the techniques' operation;" and

Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786). Although the holding in *Daubert* limited its application of these four factors to "scientific" knowledge, 509 U.S. at 597–98, 113 S.Ct. 2786, the Court in *Kumho Tire* made it clear that a trial court's gatekeeping obligation extends to all types of expert opinions. 526 U.S. at 149, 119 S.Ct. 1167. However, the Court made it equally clear that while the four *Daubert* factors may bear on the analysis of non-scientific expert testimony, these factors "do not constitute a 'definitive checklist or test,'" *id.* at 150, 119 S.Ct. 1167 (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786), and that the inquiry is "a flexible one" that "must be tied to the facts of a particular case." *Id.* (internal quotations and citations omitted). In summary, the Court in *Kumho Tire* concluded that "a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152, 119 S.Ct. 1167.

Turning to the issue of the reliability of a chiropractor's expert testimony, neither party has cited, nor could this Court find, any authority examining the issue of the admissibility of a chiropractor's testimony as an expert witness after the decision in *Kumho Tire.* However, numerous courts in this circuit and around the country have traditionally permitted chiropractors to offer expert testimony of the type proffered here where the injuries at issue relate to a party's back or neck treatment. *See, e.g., Gearin v. Wal–Mart Stores, Inc.,* 53 F.3d 216, 218 (8th Cir.1995) (discussing chiro-

practor's testimony regarding treatment and results of x-rays); *Herrero v. Gonzalez,* No. 96 CV 9478, 2000 WL 145926, at *1 (S.D.N.Y. Feb.7, 2000) (discussing the expert testimony of plaintiff's chiropractor regarding injury to plaintiff's neck and lower back suffered in an auto accident); *Oved v. Salotti,* No. 98 CV 5628, 2000 WL 1099926, *1, 2000 U.S. Dist. LEXIS 11038, at *3 (S.D.N.Y. Aug. 7, 2000) (noting that chiropractors are deemed competent expert witnesses testifying on the nature of the ailment and causation); *cf. Ilarda v. Chater,* No. 95 CV 2180, 1996 WL 389366, at * 12 (E.D.N.Y. July 8, 1996) (holding in a social security disability action that "a treating chiropractor's opinion regarding the diagnosis and degree of an impairment may be given 'significant weight,'" even if chiropractors are not listed as " 'acceptable medical sources'" under 20 C.F.R. § 404.1513; "this simply means that such an opinion is not controlling, and not to be given greater weight than the findings of medical specialists").

Looking to the four *Daubert* factors, certainly, the chiropractic technique has been tested, is utilized by numerous practitioners throughout the country, and is recognized by the State of New York as an accepted method of healthcare, through a licensing requirement that defines the nature of the practice, and establishes certain requirements and limitations on the practice. *See* N.Y. Educ. Law § 6551 (McKinney 1985, 1998 Supp.). Similarly, while there may be disagreement among the scientific community as to the scientific theory underlying chiropractic medicine and explaining how chiropractic treatments work, the American Medical Association now permits chiropractors to receive referrals from doctors for diagnosis and therapy. (American Medical Assn., Council on Ethical and Judicial Affairs, E–3.041; Joint Commission on Accreditation of Healthcare Organizations § 482.20).

Given the acceptance of the medical community of the effectiveness of chiropractic techniques, particularly when limited to structural problems related to the spine, the fact that the "technique," if not the "theory," has been subjected to testing and has been used for an extended period of time, and the fact that there are generally recognized standards with respect to the technique, this Court finds that there are sufficient indicia of experience-based "reliability" as defined by Rule 702 and *Kumho Tire* to permit plaintiffs' chiropractic expert to testify at trial.

While defendant is correct that a chiropractor is prohibited in New York from treating various illnesses, such as infectious diseases, or from operating or prescribing medications, the absence of certain types of testing goes to the weight and not the admissibility of plaintiffs' expert's testimony. The Court in *Kumho Tire* did not eliminate all expert testimony where there is an absence of undisputed scientific basis to explain how it works. Rather, the Court, in emphasizing all four *Daubert* factors and in recognizing the need for flexibility in analysis, cautioned trial courts to take a more vigilant approach in permitting the testimony of experience-based types of specialized knowledge. The Court did not suggest that all non-scientific-based expert testimony would no longer be admissible.

Defendant argues that the court in *Lee v. Midwestern Distribution, Inc.,* No. 88 CV 5694, 1989 WL 90802, at *4 (S.D.N.Y. Aug.7, 1989), found the chiropractor's report insufficient to establish non-permanent injury under New York's no-fault statute. However, while the court in *Lee* noted that chiropractors in New York are "forbidden to practice medicine as that term is statutorily defined," *id.* at *4 (citing *Chiropractic Ass'n of N.Y., Inc. v. Hilleboe,* 12 N.Y.2d 109, 116, 187 N.E.2d

756, 759, 237 N.Y.S.2d 289, 293 (1962)) (holding "[c]hiropractors are not authorized to diagnose or treat patients for disease")), the New York Court of Appeals has "never explicitly passed on whether the objective medical evidence [necessary to show permanent loss or significant limitation] must be medical as opposed to [a] non-medical chiropractic report." *Id.* Reviewing various appellate panel decisions accepting chiropractors'· reports as sufficient to defeat summary judgment, particularly where the report relies on objective evidence such as x-rays or range of motion tests, *see id.* (citing *Ottavio v. Moore,* 141 A.D.2d 806, 807, 529 N.Y.S.2d 876, 877 (2d Dep't 1988) (mem.) (finding sufficient a chiropractor's report based on an x-ray), *appeal denied,* 73 N.Y.2d 704, 534 N.E.2d 330, 537 N.Y.S.2d 492 (1989)); and *Amodeo v. Pitcher,* 125 A.D.2d 850, 509 N.Y.S.2d 957 (3d Dep't 1986) (mem.) (finding sufficient a chiropractor's report based on range of motion testing)), the Court in *Lee* concluded that "New York state courts do not bar *per se* use of a chiropractor's report to show serious injury in either the significant limitation or permanent loss categories." *Lee v. Midwestern Distribution, Inc.,* 1989 WL 90802, at *6. The court cautioned that chiropractors' reports should be "scrutinized with great care" to determine that their conclusions are based on objective evidence, since "most chiropractors' opinions are based on a patient's subjective expressions of pain." *Id.* In rejecting the affidavit submitted in the *Lee* case, the court in *Lee* concluded that because the chiropractor's report failed to state the exact percentage limitations of movement, the report failed to establish a "substantial" as opposed to " 'minor, mild or slight' " limitation, as required by the no-fault-law. *Id.* at *7; *see also Gjelaj v. Ludde,* 281 A.D.2d 211, 721 N.Y.S.2d 643 (1st Dep't 2001) (holding that a chiropractor's affidavit that fails to specify the degree of limitation or restriction for spinal injuries is inadequate to defeat a motion for summary judgment).

Accordingly, this Court finds the testimony of the chiropractor admissible under Rule 702 and under New York State precedent relating to proof of "serious injury."

b. *Proof of "Serious Injury"*

 Under Section 5104 of New York's "no-fault law," a plaintiff may not recover for non-economic losses such as pain and suffering unless she can prove that she suffered an injury caused by defendant that resulted in

death; dismemberment, significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a nonpermanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d). *See Yanez v. City of N.Y.,* 29 F.Supp.2d 100, 112–113 (E.D.N.Y.1998). An injured party who suffers "minor" injuries that do not fall within one of these categories has no right to recover for pain and suffering, *see id.* at 113; *see also Liberty Mutual Ins. Co. v. United States,* 490 F.Supp. 328 (E.D.N.Y. 1980), and the New York courts have held that the no-fault statute is to "be strictly construed." *Liberty Mutual Ins. Co. v. United States,* 490 F.Supp. at 330 (citing cases); *see also Stossel v. Fleyshmahker,* 117 Misc.2d 454, 455, 458 N.Y.S.2d 484, 485 (N.Y.City Civ.Ct.1983).

■ Thus, where there is a claim of significant limitation of use, the "significance of the limitation must be supported by 'credible medical evidence and must be objectively measured and quantified.'" *DeJesus v. Rafael,* No. 00 CV 5137, 2003 WL 21305358, at *2 (S.D.N.Y. June 5, 2003) (quoting *Ventra v. United States* 121 F.Supp.2d 326, 333–34 (S.D.N.Y.2000)). "Subjective complaints of pain do not suffice." *Id.* New York courts have consistently held that "a diagnosis of loss of range of motion, because it is dependent on the patient's subjective expressions of pain, is insufficient to support an objective finding of a serious injury." *Gillick v. Knightes,* 279 A.D.2d 752, 752, 719 N.Y.S.2d 335, 336 (3d Dep't 2001) (citing cases); *see also Mastrantuono v. United States,* 163 F.Supp.2d 244, 254 (S.D.N.Y. 2001) (holding that a plaintiff must demonstrate "more than ... a minor, mild or slight limitation of use"') (citation omitted).

■ While MRI's, x-rays and CT scans are clearly objective evidence, the courts have also considered passive range of motion tests which are based on objective criteria, such as straight-leg raising tests, and observations of spasms as objective evidence because they are not based on the patient's complaints of pain. *See DeJesus v. Rafael,* 2003 WL 21305358, at*2; *Mastrantuono v. United States,* 163 F.Supp.2d at 255. "To prove the extent of a physical limitation, 'an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury.'" *Bewry v. Colonial Freight Sys.,* No. 01 CV 5634, 2002 WL 31834434, at *3 (S.D.N.Y. Dec. 17, 2002) (quoting *Toure v. Avis Rent A Car Systems, Inc.,* 98 N.Y.2d 345, 350, 774 N.E.2d 1197, 746 N.Y.S.2d 865 (2002)). "In addition, 'an expert's qualitative assessment of a plaintiff's condition also may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system.'" *Id.* (quoting *Toure v. Avis Rent A Car Systems, Inc.,* 98 N.Y.2d at 350, 746 N.Y.S.2d 865, 774 N.E.2d 1197). Moreover, there must be a "recent examination" of plaintiff on which the objective medical findings have been made, *see Kauderer v. Penta,* 261 A.D.2d 365, 689 N.Y.S.2d 190 (2d Dep't 1999); "'any significant lapse of time between the cessation of the plaintiff's medical treatments after the accident and the physical examination conducted by his own expert must be adequately explained.'" *DeJesus v. Rafael,* 2003 WL 21305358, at *3 (citing *Grossman v. Wright,* 268 A.D.2d 79, 707 N.Y.S.2d 233, 237 (2d Dep't 2000)).

Considering these principles and the testimony presented at trial, as discussed below, this Court concludes that plaintiff has failed to sustain her burden of proving serious injury.

### c. *Ms. Hodder's Injuries and Treatment*

### (i) *Plaintiff's Testimony*

Four days after the accident, Ms. Hodder went to see Dr. John Iozzio, a licensed acupuncturist and chiropractor licensed by the State of New York for 23 years, whose name Ms. Hodder got from a friend. (Tr. at 4, 18). According to plaintiff, Dr. Iozzio took a history from her on the first visit, asked what her complaints were, and then spent approximately thirty minutes performing adjustments to her neck, back and shoulder. (*Id.* at 18–20). She also received hot packs, as well as acupuncture to her neck and back. (*Id.* at 20). According to Ms. Hodder, she treated with Dr. Iozzio for seven months, seeing him once or twice a week. (*Id.*) She also attended Brooklyn Physical Therapy once or twice a week for six months, where she performed various

exercises and received heat treatments and massages. (*Id.* at 22).

According to Ms. Hodder, she had been employed by the New York City Department of Aging for seven years. (*Id.* at 24). As a nutrition consultant, her duties required that she travel by car to various centers for the aging where she inspected the food service and sanitary conditions at each location, after which she would prepare reports and other job related paperwork. (*Id.* at 24–25).

Ms. Hodder testified that following the accident, she was out of work for six weeks. (*Id.* at 25). She conceded on cross-examination that three weeks after the accident, she traveled to Nigeria because of a family emergency. (*Id.* at 35–36). She claimed that while in Nigeria, where she spent two and one half weeks, she visited a clinic, the Federal Medical Center, eighteen times. (*Id.* at 4, 21–22). There she received chiropractic treatments, vibration, massage and hot packs.[4] (*Id.* at 22).

After she returned to work, Ms. Hodder performed her duties on a limited basis for six and one half months. (*Id.* at 25). During this time, she stayed more in the office, because driving caused her excruciating pain in her neck and back. (*Id.* at 25–26). She also suffered from pain in her left leg and left foot which was often numb. (*Id.* at 26). Approximately eight months after the accident, she tried to resume her full duties, noting that she had pain, "a little bit here and there," that caused her to take thirty to thirty-five sick days. (*Id.* at 26–27).

She testified that as a result of the accident, she is now afraid to drive. (*Id.* at 27). She used to love driving but now she is phobic and has panic attacks; she can no longer drive long distances. (*Id.*) She also claims that she no longer "window shops" because standing and walking are painful. (*Id.* at 28). She wears sneakers now instead of heels and she testified that her husband and son do most of the work around the house, cooking and cleaning. (*Id.* at 28–29).

### (ii) *Dr. Iozzio*

To corroborate her claim of injury, Dr. Iozzio[5] testified that he first saw Ms. Hodder on April 21, 2001, at which time he took a history from her. (*Id.* at 57). According to Dr. Iozzio, Ms. Hodder told Dr. Iozzio that she was in an accident, and that she struck her chest and shoulder on the steering wheel even though she was wearing her lap and shoulder belt, as a result of the frontal impact to her vehicle. (*Id.* at 58). She also told the doctor that she blacked out for "a second or two." (*Id.*)

Dr. Iozzio took x-rays, which were negative for any fractures, and then conducted a physical exam of both her cervical and lumbar spine. (*Id.* at 58–59). He noted muscle spasms in both cervical and lumbar spine, with more sensitivity on the right side. (*Id.* at 59). He then saw her on a regular basis for a total of 37 visits from April 21, 2001 to October 18, 2002. (*Id.* at 60). During these other visits, which each lasted approximately an hour to an hour and a half, he performed spinal manipulation, gave her hot packs and acupuncture treatment. (*Id.* at 60–62).

He testified that he performed various range of motion tests on Ms. Hodder, first on April 21, 2001, and then again on May 30, 2001, July 11, 2001, December 11, 2001, and on October 2, 2002, which was Ms.

---

4. Plaintiff did not present any evidence to corroborate these eighteen visits to the Federal Medical Center.

5. Defendant objected to Dr. Iozzio's testimony arguing that chiropractors are not capable of testifying about "serious injury" in New York. That issue is addressed *supra* at pages 15–20.

Hodder's final visit with Dr. Iozzio. (*Id.* at 62–63, 65–68). He testified that as a result of the range of motion testing on the first visit in April 2001, he determined that the range of motion in her cervical spine was completely restricted and she also had restriction in her lumbar spine as far as lateral and forward flexion was concerned. (*Id.* at 63). While some of these range of motion tests, as performed over time, improved somewhat or fluctuated, by the final visit on October 8, 2002, Dr. Iozzio still found that there was a loss of range of motion in the cervical spine, noting that she had full range of motion in the lumbar spine but it was painful. (*Id.* at 68–69).

He concluded that she was disabled from the date of the accident until May 29, 2001. (*Id.* at 70). After that, he opined that she was capable of working on a limited or light duty schedule for six and half months thereafter. (*Id.* at 72). He diagnosed her as having "strains and sprains to the cervical spine," strains and sprains to the right shoulder, "lumbar posterior facet syndrome," myofacial pain syndrome," and "cervical cranial syndrome," which he described as injury to the soft tissues and occipital portion of the head which can cause headaches. (*Id.* at 73–76). He described the accident of April 2001 as the competent producing cause of these injuries. (*Id.* at 76).

He further testified that during the final visit on October 8, 2002, Ms. Hodder had complaints of recurring pain, particularly in her right shoulder, which prevented her from lifting and carrying. (*Id.* at 76). She also continued to experience headaches. (*Id.*) He concluded that she had suffered permanent injury to her cervical and lumbar spine. (*Id.* at 77–80).

On cross-examination, Dr. Iozzio conceded that he was unaware of Ms. Hodder's past medical complaints about her foot, hip and shoulder. (*Id.* at 86). He testified that she had told him that she had

no prior conditions. (*Id.*) However, the records of her prior treating physician, Dr. Lue, indicate that she saw Dr. Lue in April 1995, complaining of pain in the left foot and hip, as well as shoulder pain. (*Id.* at 86, 126). In November 1995, she also complained to Dr. Lue about left shoulder pain, and in February 1996, she complained about pain in the joints in her hand. (*Id.* at 86). Thereafter, in March 1998 and October 1998, she complained of pain in her knee and elbow, respectively. (*Id.*) However, perhaps most important, she complained about experiencing occipital headaches in December 1999, long before the April 2001 accident. (*Id.* 86–87).

(iii) *Dr. Goldberg*

To rebut Dr. Iozzio's testimony, defendant called Dr. Robert Goldberg, a board certified osteopath, licensed to practice in New York, New Jersey, and Pennsylvania, specializing in physical medicine and rehabilitation, as well as electro-diagnostic medicine. (*Id.* at 109, 112). He currently holds a position as Clinical Associate Professor at New York Medical College and is Chairman of the Department of Physical Medicine and Rehabilitation at the Philadelphia College of Osteopathy. (*Id.* at 111). He explained that neither a chiropractor or an acupuncturist is licensed under New York State law to prescribe medication or to use invasive techniques. (*Id.* at 110).

According to Dr. Goldberg, he saw Ms. Hodder on October 16, 2002, approximately one week after she saw Dr. Iozzio for the last time when Dr. Iozzio found her still suffering from a limited range of motion and declared her permanently disabled. (*Id.* at 113). During her examination by Dr. Goldberg, Ms. Hodder complained of pain in her left shoulder, as well as pain in her lower back and neck, which she attributed to a head-on impact.

(*Id.* at 117–120, 161). She also complained of cracking in her shoulder and neck, numbness and tingling in her arm, and weakness when lifting. (*Id.* at 113–14). She also told Dr. Goldberg that she injured her left shoulder as well. (*Id.* at 113, 158). He reviewed x-rays taken at Methodist Hospital of her chest and both shoulders which showed no dislocations or disfigurements. (*Id.* at 115–17). Her neurological examination was also normal. (*Id.* at 115). In reviewing the records from the fire department, he noticed that there was no evidence of bleeding, lacerations, or loss of consciousness, and indeed, the hospital report reflected that plaintiff "denie[d]" loss of consciousness. (*Id.* at 116). The hospital records also gave no diagnosis except "MVA," meaning "motor vehicle accident" and described no objective conditions. (*Id.* at 117). The x-rays taken at the hospital showed that her chest and shoulders were normal and her sternum was also normal. (*Id.*)

Similarly, aside from Ms. Hodder's subjective complaints of pain in her neck and back, Dr. Goldberg found no objective abnormalities in October 2002. (*Id.* at 117–18). Unlike Dr. Iozzio, Dr. Goldberg found no restrictions or limitations in range of motion in Ms. Hodder's cervical or lumbar spine. (*Id.*) Overall, he disagreed with Dr. Iozzio's diagnoses. (*Id.* at 118). Indeed, he questioned the sincerity of Ms. Hodder's reports of pain, noting that during the examination, Ms. Hodder complained of pain upon motion of her left shoulder. (*Id.*) However, after she left the examining room, when she may have believed she was no longer under the doctor's observation, Dr. Goldberg saw her putting on her coat in the waiting room, raising her hands overhead, straightening her arms and using her arms and shoulders in ways that far exceeded anything she would do or would allow Dr. Goldberg to do to her during the examination. (*Id.*

at 118–19). He also testified that he conducted an objective test with a tuning fork. (*Id.* at 119). According to the doctor's testimony, Ms. Hodder's subjective responses, claiming numbness in reaction to this test, were inconsistent with the objective observations made by the doctor. (*Id.* at 120–21).

The doctor testified that as part of his preparation in reaching his opinion as to her medical condition, he reviewed Dr. Lue's records, discovering that not only did Ms. Hodder suffer from diabetes and hypertension, but as early as April 19, 1995, she complained of pain in her left hip, left foot, and left shoulder from carrying a heavy pocketbook. (*Id.* at 122, 126). On October 5, 1995, several years before the accident, x-rays were performed of her shoulders and hips, indicating that she had degenerative joint disease in her hips. (*Id.* at 126–27). According to Dr. Lue's records, she continued over the next year to complain about pain in her left knee and then, in October 1998, she began complaining of pain in her right elbow. (*Id.* at 127). Finally, in December 1999, she complained of occipital headaches, shoulder pain and pain in the cervical spine. (*Id.*) An x-ray performed by Marine Park Radiologists and Community Radiologists on December 12, 1999 showed a mild loss of height and bony changes in her spine, which, according to Dr. Goldberg, are symptoms of osteoarthritis. (*Id.* at 128). There was also evidence on these x-rays of degeneration in multiple levels of her cervical spine as well as in her left shoulder. (*Id.*) On May 13, 2000, the records of Dr. Lue reflect that Ms. Hodder expressed complaints of pain in her left upper back which she claimed was aggravated by driving. (*Id.* at 129). Dr. Goldberg explained that to the extent that Ms. Hodder may have limited range of motion in her neck, it was due to the bone spurs that were evidence of an already existing, long-standing condi-

tion in her spine and that also contributed to the pain in her scalp. (*Id.* at 133).

With respect to the April 17, 2001 accident, Dr. Lue's records demonstrate that Ms. Hodder only mentioned the April 17, 2001 accident to Dr. Lue on December 6, 2001, when she complained to him of chills and body aches and told him she was under a chiropractor's care. (*Id.* at 130–31). However, even during that visit in December 2001, Ms. Hodder does not appear to have made specific claims of pain relative to her neck, back, or shoulders that were noted by the doctor in his records. (*Id.*) The records also reflect no complaints to Dr. Lue in the eight months after the accident prior to December 2001, and no complaints relative to her neck, back or shoulders in any of Ms. Hodder's subsequent visits to Dr. Lue on February 10, 2002, and July 20, 2002. (*Id.* at 130–32).

Dr. Goldberg's conclusion was that plaintiff had suffered a cervical sprain imposed on already existing osteoarthritis. (*Id.* at 134). He testified that he saw no residuals from the accident but instead concluded that Ms. Hodder suffered from a congenital condition in her lumbar spine known as "transitional vertebra." (*Id.* at 135). He also concluded that the pain in her left shoulder was unrelated to the accident as demonstrated by Dr. Lue's notes, and that she had fully recovered from any contusion to the chest or trauma to the right shoulder. (*Id.* at 136). He testified that because Dr. Iozzio had only performed one physical examination in April 2001 and then simply treated her thereafter, it was impossible to tell when the sprains, which usually do persist for a long period, were resolved. (*Id.* at 137–38).

(iv) *Surveillance Tapes*

In addition to the testimony of Dr. Goldberg, which raised serious questions regarding the true extent of plaintiff's injuries, the government introduced four surveillance videos of Ms. Hodder, recorded by members of the United States Postal Service Inspector General's Office on four separate occasions: November 15, 2002, November 22, 2002, November 24, 2002, and December 3, 2002.[6]

The videotapes revealed several things. In the videotape of November 15, 2002, Ms. Hodder was surveilled walking in low heeled shoes, not sneakers, as she testified she was forced to wear consistently after the accident. (Ex. M). In the November 22, 2002 videotape, Ms. Hodder is shown walking to her apartment complex, this time wearing sneakers, and carrying a bulging pocket book on her left shoulder with a shopping bag in her right hand. (Ex. N). After arriving in the parking lot, she appears to have switched hands, transferring the shoulder bag to her right side and the shopping bag to her left hand. (*Id.*)

Perhaps more important, however, in the November 24, 2002 videotape, Ms. Hodder is depicted pushing a shopping cart loaded with groceries to her car which is parked in the parking lot of a shopping center. (Ex. P). She can be seen on the videotape lifting her arms over her shoulder to take her purse off of her shoulder. (*Id.*) She bends over into the car and then returns to the trunk where she unloads the grocery bags from the car and into the trunk. (*Id.*) She lifts what appears to be heavy bags filled with various items, using her right arm alone, and also at times, she lifts bags with both arms. (*Id.*) She also bends into the bottom of the shopping cart

---

**6.** This Court notes that the first of these videotapes was made approximately one week after Ms. Hodder's visit to Dr. Goldberg and two weeks after her final visit to Dr. Iozzio, when he found permanent limitations in her range of motion.

to retrieve certain items and then bends her neck to look into the cart. (*Id.*) Finally, she lifts her right arm up above her head to close the trunk. (*Id.*) Although it takes her some time to complete the task of unloading the cart, she does not appear to be in pain or restricted in her movements in any way. Instead, she spends much of this time tying bags and rearranging items within the trunk and within the bags themselves. (*Id.*)

The tape of November 24, 2002 continues when Ms. Hodder returns to her residence and is filmed unloading the trunk of her car. (*Id.*) Not only does she lift the bags of groceries out of the trunk but on numerous occasions, she bends over at the waist without any apparent difficulty, placing the bags on the ground. (*Id.*) Her husband, who she testified does most of the household chores, is shown in the videotape, standing behind her, watching as she lifts the bags from the trunk. (*Id.*) Toward the end of the sequence, he lifts out one bag to help her. (*Id.*)

Not only does Ms. Hodder lift her left arm over her head to wave at someone in this videotape, but she drives her car to park it, and then walks back to the entrance of her residence, carrying several bags, which appear to be heavy, in her left hand. (*Id.*)

In the December 3, 2002 videotape, Ms. Hodder is surveilled walking down Wil-loughby Street, with her shoulder bag on her left arm, carrying a large shopping bag in her right hand. (Ex. R). Again, she is walking at a normal pace without any noticeable problem, and at one point she seems to be hurrying down the street. (*Id.*) When she arrives home, she is seen carrying a heavy-looking box from her car to the residence. (*Id.*) Indeed, at one point, she is seen bending over a second box, at which time a man comes over to help her and he carries the box into the residence. (*Id.*)

### d. *Significant Limitation*

 Here, it appears that the category of serious injury that most accurately encompasses Ms. Hodder's complaints and the medical evidence she has assembled is that of a "significant limitation or use of a body function or system." [7] N.Y. Ins. Law § 5102(d). In determining whether an alleged limitation is "significant," the court compares "the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Toure v. Avis Rent A Car Systems, Inc.*, 98 N.Y.2d at 353, 774 N.E.2d at 1201, 746 N.Y.S.2d at 869 (quoting *Dufel v. Green*, 84 N.Y.2d 795, 798, 622 N.Y.S.2d 900, 647 N.E.2d 105 (1995)); *see Bewry v. Colonial Freight Systems*, 2002 WL 31834434, at *3. While proof of permanence is not required, plaintiff must show a limitation that is

---

7. Although Ms. Hodder alleges "a permanent loss of use of a body organ, member, function or system, the law requires a total, permanent loss". *See Oberly v. Bangs Ambulance Inc.*, 96 N.Y.2d 295, 296, 727 N.Y.S.2d 378, 381, 751 N.E.2d 457 (2001); *Best v. Bleau*, 300 A.D.2d 858, 860, 752 N.Y.S.2d 427, 429 (3d Dep't 2002). As discussed below, the evidence here fails to demonstrate a significant limitation of use, much less a total permanent loss. *See Ceruti v. Abernathy*, 285 A.D.2d 386, 386, 728 N.Y.S.2d 445, 446 (1st Dep't 2001) (holding that "some neck pain, lower back pain and stiffness and headaches— do not constitute 'permanent loss of use of a body organ, member, function or system' or 'significant limitation of use . . .'" under Insurance Law § 5102(d)). The only evidence of permanence are the conclusory statements of Dr. Iozzio which seem belied by plaintiff's own activity as shown on the videotapes. *See Gualtieri v. Farina*, 283 F.Supp.2d 917, 924 (S.D.N.Y.2003) (finding that "[m]ere conclusory statements by her physician" as to the nature and extent of permanence "are not sufficient to raise a triable issue of fact" for purposes of summary judgment). This Court finds such conclusory statements are insufficient to establish serious injury in this case.

significant in terms of duration as well as degree. *See Partlow v. Meehan,* 155 A.D.2d 647, 647–48, 548 N.Y.S.2d 239, 240 (2d Dep't 1989) (holding that, "[a]lthough § 5102(d) does not expressly set forth any temporal requirement for a 'significant limitation,' if a bodily limitation is substantial in degree yet only fleeting in duration, it should not qualify as a 'serious injury' under the statute"); *Gualtieri v. Farina,* 283 F.Supp.2d at 925 (holding that "[i]n order to make out a *prima facie* case of significant limitation, plaintiff must show a significant limitation in both degree and duration").

 Here, the only objective medical evidence submitted by Ms. Hodder to show serious injury relies largely on Dr. Iozzio's range of motion tests of the cervical and lumbar spine and his observation of spasm on the first visit. She has not submitted any MRI's or CT scans, and the x-rays that were taken were negative. However, while MRIs or CT scans of a patient who has sustained a cervical sprain or strain may be normal, range of motion tests may be the only way to diagnose the sort of injury claimed.

As Dr. Goldberg testified, there are two types of range of motion tests: passive and active. (Tr. at 118). In performing active range of motion tests, the patient is asked to move the body part at issue in various directions and is asked to indicate when further movement becomes restricted or painful. In the passive range of motion test, the examiner moves the injured body part until the motion is restricted or pain is created. The doctor measures the range of the patient's ability to move the subject body part, sometimes with a protractor, and then compares that to the patient's "normal" range of motion if the patient has a prior history with the doctor, or with what is considered normal of people of the same age and sex of the patient.

The results of the passive test are "based upon more objective criteria," *see Mastrantuono v. United States,* 163 F.Supp.2d at 255, because the doctor controls the movements. *But see Gillick v. Knightes,* 279 A.D.2d 752, 752, 719 N.Y.S.2d 335, 336 (2d Dep't 2001) (noting that "[w]e have repeatedly held that a diagnosis of loss of range of motion because it is dependent on the patient's subjective expression of pain, is insufficient to support an objective finding of serious injury"). However, the fact is that most doctors will stop moving the patient once the patient begins to complain of pain, whether truthful or not. Thus, courts have required that the physician conduct objective range of motion tests, and quantify the results of the range of motion tests. *See Williams v. Ritchie,* 139 F.Supp.2d 330, 340 (E.D.N.Y.2001) (Glasser, J.) ("To establish [significant injury], a medical affidavit specifying the degree of restriction of movement suffered and the objective tests performed to determine such restriction of movement is generally satisfactory") (quotation marks and citations omitted); *Palasek v. Misita,* 289 A.D.2d 313, 313, 734 N.Y.S.2d 587, 588 (2d Dep't 2001) (affirming summary judgment for the defendant where, *inter alia,* the affidavit from plaintiff's treating physician "failed to set forth the objective medical tests performed by the examining physician to determine that the plaintiff suffered specifically qualified restrictions of motion in her neck and back"); *Perotte v. New York City Transit Authority,* 250 A.D.2d 746, 673 N.Y.S.2d 442 (2d Dep't 1998) (finding medical evidence alleging loss of range of motion in cervical and lumbar spine which failed to specify extent or degree of the limitation was insufficient to raise a triable issue of fact as to serious injury).

While there is no set percentage for determining whether a limitation in range of motion is sufficient to establish "serious injury," the cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes. *See, e.g., Thompkins v. Santos,* No. 98 CV 4634, 1999 WL 1043966, at *6 (S.D.N.Y. Nov.16, 1999) (holding that a triable issue of fact existed where the physician's report indicated a 20 degree loss of mobility in the lumbar spine and a 10 degree loss of mobility in the cervical spine); *Amofa v. N.S.C. Leasing Corp.,* 247 A.D.2d 289, 668 N.Y.S.2d 460 (1st Dep't 1998) (finding 25% loss of spinal range of motion significant); *Livai v. Amoroso,* 239 A.D.2d 565, 658 N.Y.S.2d 973 (2d Dep't 1997) (finding 20% restriction of motion in cervical spine significant); *see also Bates v. Peeples,* 171 A.D.2d 635, 635, 566 N.Y.S.2d 659, 660 (2d Dep't 1991) (affirming denial of summary judgment where plaintiff had suffered a restriction of "flexion 40 degrees, extension 10 degrees, lateral bending 10 degrees"). However, less than 20% limitation has been found insufficient to survive a motion for summary judgment. *See, e.g., Cooper v. Dunn,* No. 99 CV 6903, 2001 WL 138864, at *7 (E.D.N.Y. Jan.2, 2001) (holding 10%–20% limitation in range of motion in the back was not significant); *Sellitto v. Casey,* 268 A.D.2d 753, 755, 702 N.Y.S.2d 177, 180 (2d Dep't 2000) (holding 10% loss of range of motion in shoulder is not a significant limitation); *Waldman v. Chang,* 175 A.D.2d 204, 204, 572 N.Y.S.2d 79, 80 (2d Dep't 1991) (finding 15% limitation in the range of motion of the cervical spine and back not significant as a matter of law).

Here, Dr. Iozzio's findings indicated that Ms. Hodder's range of motion for her lumbar spine in April 2001, at the time of the first visit, was 45 degrees in forward flexion, as compared with normal lumbar spine flexion which is normally rated at 90 degrees. (Tr. at 63). He described the flexion in Ms. Hodder's cervical spine at that time as "minimal, at best," but he "did not note a particular degree because of the condition she was in." (*Id.*) He testified that he also found restrictions in the range of motion for extension, rotation bilaterally, and lateral bending. (*Id.*) While he testified as to the normal ranges for each of these motions, he did not consistently quantify the ranges he observed as to Ms. Hodder, nor did he explain whether the tests conducted were passive or were based on Ms. Hodder's subjective reports of pain. (*Id.* at 63–64).

He conducted additional range of motion tests on May 30, 2001, July 31, 2001, December 11, 2001 and October 8, 2002, with varying results.[8] These results are set forth below:

Plaintiff's Results

| Cervical | Normal Rates | 5/30/01 | 7/31/01 | 12/11/01 | 10/08/02 |
|---|---|---|---|---|---|
| Flexion | 60 | 15 | 25 | 25 | 25 |
| Extension | 50 | 5 | 15 | 25 | 15 |
| Left Rotation | 80 | 20 | Full | 45 | Full |
| Right Rotation | 80 | 10 | 25 | 30 | 25 |
| Lateral Bending | 40 | NRF [9] | NRF | NRF | NRF |

8. Whether he conducted tests on all areas on each occasion is not clear from his testimony.

| Lumbar | Normal Rates | 05/30/01 | 07/31/01 | 12/11/01 | 10/08/02 |
|---|---|---|---|---|---|
| Flexion | 90 | 45 | NRF | 60 | 75 w/ pain |
| Extension | 50 | 5 | NRF | 10 | Complete w/ pain |
| Left Rotation | 30 | 10 | NRF | NRF | Full w/ pain |
| Right Rotation | 30 | 10 | NRF | NRF | Full w/ pain |
| Bending | 20 | NRF | NRF | NRF | Full w/ pain |

Dr. Iozzio's findings are not particularly useful to this Court because he never clarified whether the tests he conducted to elicit these results were passive or active range of motion tests. Moreover, he conceded that despite these results, plaintiff was given authorization to return to work after six weeks. (Tr. at 69–70). While the spasms in her back which he noted on the first visit were definite objective signs of injury, he did not examine her after that first visit except to test her range of motion and provide various forms of chiropractic treatment. There is no evidence in the record to indicate whether he observed spasms in her back at any other visit. Dr. Iozzio's conclusion upon seeing her in October 2002 was that although there had been some improvement, Ms. Hodder still suffered from loss of range of motion in the cervical spine, and had full but painful motion on the lumbar spine. (*Id.* at 68–69).

However, Dr. Goldberg found no objective evidence of any abnormalities when he examined Ms. Hodder two weeks later. His range of motion tests suggested that there were no limitations in her range of motion as of October 2002 when he examined Ms. Hodder. He also found that her subjective responses to certain objective tests were inconsistent with his objective findings and that although she complained of pain in his office when asked to make certain movements, her actions in the wait-ing room seemed to exceed her claimed abilities in his office.

Dr. Goldberg's findings, coupled with Dr. Iozzio's failure to specify the nature of his tests, and his failure to conduct a physical examination of plaintiff beyond the first visit, leads the Court to discount Dr. Iozzio's conclusion that Ms. Hodder suffers from any significant limitation that would satisfy the no-fault threshold. *See McCreesh v. Hoehn*, 307 A.D.2d 638, 638, 762 N.Y.S.2d 527, 527 (3d Dep't 2003) (rejecting chiropractor's finding of permanent loss of function in cervical spine where the opinion was "unsupported by any mention of the objective tests performed"); *Mitchell v. Kowalski*, 272 A.D.2d 530, 530, 708 N.Y.S.2d 437, 438 (2d Dep't 2000) (affirming trial court's grant of judgment in favor of defendant where plaintiff's chiropractor "testified to the degree of limitation in range of motion of the plaintiff's neck, [but] he did not testify to the objective tests used to arrive at his conclusions"). Moreover, while Ms. Hodder claimed that as a result of the accident, she is afraid to drive, cannot "window shop" because walking is painful, and leaves the housework to her husband and son, these claims are called into question by the surveillance videos. These videos showing her driving to and from the grocery store, walking down the street carrying a shopping bag, and loading and unloading groceries, while her husband stands by and watches. Al-

(*See* Tr. at 63–69).

**9.** "NRF" means there were no reported findings by Dr. Iozzio on these dated for these types of motions.

though she claims to be suffering from limitations in her ability to move her back, arms and shoulders, the videos depict her engaging in all of these motions without any apparent pain or visible restriction.

■ Accordingly, based on all the evidence, this Court credits Dr. Goldberg's testimony and finds that plaintiff has not established a serious injury sufficient to satisfy the threshold for recovery under New York law.[10]

### e. *90/180 Days*

■ A third means by which a plaintiff can establish a "serious injury" sufficient to survive the threshold requirement is if she can demonstrate that her "medically-determined injury or impairment" rendered it impossible for her to perform "substantially all of her normal activities for 90 out of the first 180 days subsequent to the accident." *Mitchell v. Kowalski*, 272 A.D.2d at 530–31, 708 N.Y.S.2d at 438 (citing cases).

■ Here, at most, plaintiff missed six weeks of work following the accident and Dr. Iozzio conceded that she was able to return to work at that time. (Tr. at 69–70). Although she also claimed that she missed 30–35 days of work thereafter, she did not submit any evidence to support that claim. Not only does that mean she was out of work for only 42 days after the accident, but her inability to work for that entire time is called into question by the fact that the two and one-half weeks imme-

diately after the accident she spent traveling to Nigeria. Similarly, her testimony that she was unable to perform her normal household responsibilities was not corroborated by her husband and, indeed, was contradicted by the video surveillance which shows her doing the shopping and unloading the car without any help from her husband who is seen standing by, watching.

Under these circumstances, the Court finds that she has failed to establish that she was prevented from performing her daily activities for not less than ninety out of 180 days following the accident. *See Ceruti v. Abernathy*, 285 A.D.2d 386, 386–87, 728 N.Y.S.2d 445, 446.

### 4) *The Property Damage Claim*

Ms. Hodder testified that she and her husband are both owners of a 1991 Nissan, the car she was driving in the accident. (Tr. at 29). She testified that the car has been insured with Geico for the last five years and that both she and her husband are listed on the insurance policy. (*Id.* at 31). She conceded, however, that she never filed a claim with Geico for the property damage to the car because what she was really concerned about was her health. (*Id.* at 43–44).

Mr. Hodder confirmed her testimony, indicating that the vehicle was insured with Geico under both names. (*Id.* at 47). However, neither witness had the title to the vehicle, nor did they present a record corroborating their joint insurance coverage at the time of the accident.[11] (*Id.* at

---

10. Apart from her inability to establish serious injury, the plaintiff has also failed to show that the accident was the proximate cause of all of her claimed injuries. *Gardner v. United States*, 896 F.Supp. 89, 92 (N.D.N.Y.1995). An act or omission is a proximate cause of an injury if it was a substantial factor in bringing about the injury. *See Nallan v. Helmsley—Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980); *see* Restatement Second, Torts § 431, Comment a; *Ortiz v. Kionoshita & Co.*, 30 A.D.2d 334, 292 N.Y.S.2d 48

(1st Dep't 1968). In this case, the evidence suggests that as to her complaints of shoulder pain and occipital headaches, the records from Dr. Lue indicate that she had made similar complaints before the accident occurred.

11. Although the plaintiffs sought to introduce an insurance certificate dated August 2003, defendant's objection to that exhibit as irrelevant was sustained. (Pls.' Ex. 1).

30–32). Mr. Hodder also testified that in 2001, the Hodders only had liability insurance on the car, not collision insurance. (*Id.* at 47–48).

Aroyo Singh, from High Tech Auto Repair, testified that he performed an appraisal of the damage to the Hodder vehicle following the accident. (*Id.* at 99). He appraised the cost of the parts and labor to be $3,370.55. (Exs.2, 2A).

Defendant argues that plaintiffs are barred from seeking compensation for the damage to Ms. Hodder's vehicle because they failed to exhaust administrative remedies prior to bringing this claim, as required under the Federal Tort Claims Act.

The Federal Tort Claims Act provides that an "action shall not be instituted upon a claim against the United States for money damages" unless the claimant first files an administrative claim with the appropriate federal agency and exhausts all administrative remedies. 28 U.S.C. § 2675(a) (1988); *see McNeil v. United States,* 508 U.S. 106, 107, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (affirming dismissal of claims where administrative claim was submitted to the agency only after suit was filed); *Muth v. United States,* 1 F.3d 246, 249 (4th Cir.1993) (affirming dismissal where claimant had failed to exhaust by filing a proper claim with the agency). Section 2401 of the Federal Tort Claims Act further provides that "[a] tort claim against the United States shall be forever barred unless presented in writing to the appropriate federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b).

■ Moreover, "if there are multiple claimants in the matter, each claimant must 'individually satisfy the jurisdictional prerequisite for filing a proper claim, unless another is legally entitled to assert such a claim on their behalf.'" *Muth v. United States,* 1 F.3d at 249 (quoting *Frantz v. United States,* 791 F.Supp. 445, 447 (D.Del.1992)). In *Urbano v. United States,* No. 93 CV 4588, 1996 WL 68562, *6 (E.D.N.Y. Feb.7, 1996), this Court found that even where tort claims are related and "one spouse files an administrative claim arising out of a personal injury but the other spouse fails to timely file a loss of . . . claim relating to the same injury, the District Court must dismiss the . . . claim for lack of subject matter jurisdiction." *Id.* at *8 (citing cases).[12]

■ In this case, Ms. Hodder filed an administrative claim for damage to the vehicle. In the Complaint, as confirmed by the Pre–Trial Order, plaintiffs allege that the vehicle was owned by Mr. Hodder and they seek damages for the vehicle only in Mr. Hodder's name. (Compl. at 8–9; Pre–Trial Order at 2). Moreover, Agent Francisco Morales testified that based on records of the government, Mr. Hodder is the registered owner of the vehicle. It is undisputed that Mr. Hodder never filed a administrative claim for damage to the vehicle, nor is there any evidence to suggest that anyone authorized by him filed such a claim.

■ Although at trial both plaintiffs testified that they owned the car jointly, they failed to introduce the title to the vehicle which would easily have verified their testimony. Given the contradictory claims in their complaint and pretrial order, the Court finds that plaintiffs have

---

**12.** Plaintiff cites a number of cases from other circuits finding that the exhaustion requirement is not jurisdictional but rather simply details the procedures under which an agency may settle a claim. *See, e.g., Dykes v. United States,* 794 F.Supp. 334, 336–37 (D.S.D.1992); *Rivera v. United States,* 761 F.Supp. 126 (S.D.Fla.1991); *see also Conn v. United States,* 867 F.2d 916 (6th Cir.1989). However, these cases were all decided prior to the Supreme Court's decision in *McNeil,* and are not controlling this case.

failed to establish that Ms. Hodder owned the vehicle or was otherwise authorized to file a claim for damage to the vehicle. Even though the claims clearly arise from the same event, it cannot be said that Mr. Hodder exhausted his administrative remedies and thus, under *McNeil*, the Court lacks jurisdiction to consider the claim for damage to the car.[13]

**SO ORDERED.**

---

**13.** Even if plaintiffs could have satisfied this Court that they had properly exhausted their administrative remedies, the Court's conclu-sion that the government is exempt from liability under the VTL would prevent recovery for these damages in any event.