Alvin PERALTA, Plaintiff,

v.

Luis E. QUINTERO, et al., Defendants.

No. 12 Civ. 3864 (FM).

United States District Court,
S.D. New York.

Signed May 20, 2014.

Joshua Brian Irwin, Gregory J. Cannata, Esq., New York, NY, for Plaintiff.

John M. Downing, Jr., Downing & Peck, P.C., New York, NY, for Defendants.

### MEMORANDUM DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

This personal injury action was removed to this Court from Supreme Court, Bronx County, on May 15, 2012. The defendants did not file a jury demand until 588 days later. In the absence of any rationale for their delay other than mere inadvertence, I found that the defendants had waived their right to a jury trial. The case then was tried before me on January 8, 9, and 13, 2014. I have considered the evidence at that trial, as well as the parties' post-trial submissions. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I now make the following findings of fact and conclusions of law with respect to the issues of liability and damages.

### I. *Liability*

#### A. *Findings of Fact*

On the evening of March 6, 2010, plaintiff Alvin Peralta ("Peralta") was driving his 1992 Honda Accord on Eldridge Street on the lower east side of Manhattan. His friend Melvin Sanchez was in the front passenger seat of the car.

As Peralta approached the intersection of Eldridge and Rivington Street, a 2006 Volkswagen Jetta driven by defendant

Luis Quintero ("Quintero") also was approaching the intersection from Rivington Street. The owner of the Jetta, Daniel Gonsalves ("Gonsalves") was in the front passenger seat.

The parties agree that there was a stop sign on Rivington Street, but not Eldridge Street, where the streets intersected. The parties further agree that both are one-way streets. Whether Quintero stopped at the stop sign and what happened next are the critical issues. Peralta contends that Quintero failed to yield to his passing vehicle and struck the passenger side of the Accord, causing the vehicle to move to the left. Peralta further contends that the impact was sufficient to cause both passenger-side doors of his Accord to deform, although they still could be opened and closed with difficulty after the collision.

Quintero, to the contrary, testified that he came to a full stop and was inching into the intersection to make a right turn when Peralta's car suddenly swerved around him. He described the Accord's speed as faster than normal, but conceded that he did not know if Peralta was traveling more than thirty miles per hour. Curiously, Quintero maintains that there was no accident. Instead, Quintero alleges that he and Gonsalves got out of their car after Peralta's car stopped simply because he felt something might have happened. Quintero also testified that the police were called to the scene even though there was no damage to either vehicle.

Simply put, Quintero's version of events makes no sense. First, if Quintero had been successfully making a right turn and Peralta swerved around him, there would have been no reason for Quintero to stop or for him and his passenger to exit their car. Second, although Quintero claimed that there was no impact, a police officer responding to the scene prepared a Police Accident Report in which he noted that "Veh. 2 [the Jetta] stated he was going straight while veh. 1 [the Accord] speeded and caused veh. 2 to hit veh. 1." (Pl.'s Ex. 1 at 1). Presumably, if there was no physical evidence that a motor vehicle accident had occurred, or if Quintero or Gonsalves had so stated, the officer preparing the report would have made note of what might prove to be a fraudulent insurance claim. Third, although Quintero testified that he was making a right turn just before the non-accident, the police report indicates that "veh[icle] 2"—presumably either Quintero or Gonsalves—stated that their vehicle was "going straight" when the accident occurred. (*Id.*). Consistent with that description, the police diagram of the incident reflects a "t-bone" collision in which Quintero struck the middle of the passenger side of Peralta's car. (*Id.*). Finally, Sanchez requested medical attention and was taken from the scene by ambulance. If the police thought the accident or Sanchez's medical complaints were feigned, the accident report likely would have contained a notation to that effect. Instead, the report identifies Sanchez as a person "injured" in the accident. (*Id.* at 2).

## B. *Conclusions of Law*

As Magistrate Judge Pollak has explained, "[u]nder New York law, the plaintiff must establish three elements in order to prevail on a negligence claim: (1) that defendant owed plaintiff a duty of care; (2) that defendant breached that duty; and (3) that the breach was the proximate cause of plaintiffs' injuries." *Hodder v. United States,* 328 F.Supp.2d 335, 341 (E.D.N.Y.2004). Further, "it is the duty of both drivers to operate their automobiles with reasonable care, taking into account the actual and potential dangers existing from weather, road, traffic and other conditions." *Id.* (citations omit-

ted). When a driver nears an intersection controlled by a stop sign, he must come to a stop, and "after having stopped shall yield the right of way to any vehicle which has entered the intersection from another highway or which is approaching so closely on said highway as to constitute an immediate hazard during the time when such driver is moving across or within the intersection." N.Y.S. Vehicle and Traffic Law § 1142(a).[1]

Here, because Quintero failed to yield the right of way to Peralta, and because there is no indication that Peralta was speeding, Quintero plainly was negligent. Indeed, his failure to obey the Vehicle and Traffic Law constitutes negligence *per se*. *Barbieri v. Vokoun*, 72 A.D.3d 853, 856, 900 N.Y.S.2d 315 (2d Dep't 2010).

## II. *Damages*

### A. *Findings of Fact*

Unlike Sanchez, Peralta did not request medical attention at the scene. A few days later, however, he sought medical attention for worsening lower back, neck, and shoulder pain. He first went to Davidson Medical, P.C., where he was provided conservative treatment including chiropractic services, electrostimulation, and massage. After four months or so, he visited Dr. Philip Rafiy, an orthopedic surgeon whose name he found on the internet. Dr. Rafiy also began with conservative treatment, including steroidal injections. Dr. Rafiy further referred Peralta to the University Heights Medical Center for other conservative treatment measures. Eventually, after reviewing various radiological images, Dr. Rafiy concluded that Peralta's considerable pain was caused by foraminal stenosis at the L4–L5 level. Dr. Rafiy agreed with the defense experts that Peralta had no disc herniations or protrusions resulting from the accident, but believed that surgery was nevertheless indicated after other treatment modalities failed to alleviate Peralta's pain.

On July 22, 2011, Dr. Rafiy performed a laminotomy and foraminotomy, removing bone at the L4–L5 level and widening the vertebral foramina. Dr. Rafiy stabilized the left side of Peralta's spine using a pin and rod and also performed bone grafts on both sides of Peralta's spine to stabilize Peralta's back. Although the surgery helped alleviate Peralta's pain, he became addicted to the Oxycontin tablets that Dr. Rafiy prescribed to help manage residual pain.

In an effort to show that the surgery was unnecessary, the defendants proffered two experts. Dr. David Fisher, a radiologist, testified that various imaging studies showed normally-aligned vertebral bodies and no protrusions that would justify the surgery. Dr. Edward Crane, an orthopedic surgeon at Lenox Hill Hospital, examined Peralta in October 2012, at which time Peralta allegedly complained of a "little pain" in his lower back and thigh. Dr. Crane indicated that the results of his physical examination were essentially normal (except to the extent that Peralta feigned pain on a straight leg raising test), that the surgery performed could not be causally connected to the alleged injury on March 6, 2010, and that Peralta had no sequelae from the surgery other than his scar. He conceded, however, that the Oxycontin that Peralta had been taking could affect the results of his physical examination—for example, by masking pain.

---

1. The term "highway" includes city streets. *See* N.Y.S. Vehicle and Traffic Law § 118 (defining the term as the "entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel").

Although Peralta had a prior motor vehicle accident in 2008, there is no indication that any of his complaints regarding back pain are attributable to this accident or anything else that preceded the events of March 6, 2010. Nor is there any indication that Peralta was a user of Oxycontin prior to the collision in 2010. In these circumstances, it simply defies credulity to suggest that Peralta would have opted for a procedure as invasive as back surgery unless he truly was in pain as a result of being broadsided by Quintero's vehicle.

After the surgery, Peralta's pain level on a 10–point scale went from a "7" or "8" to a "6," and he concedes that he now experiences less pain than he did before surgery. He also occasionally engages in sports such as handball, despite his continued pain.

To earn money, Peralta drove for a car service for several months after his surgery, during which time he switched to a larger, more expensive vehicle because the seating was more comfortable. Peralta also made deliveries and performed other chores for a pizzeria owned by his aunt.

As noted above, the Oxycontin that Peralta takes to manage his pain has caused him to have a substance abuse problem. Dr. Rafiy described Peralta's condition as a· chemical dependency secondary to his injury, which will require extensive inpatient or outpatient treatment to cure. Dr. Rafiy estimates that this treatment would cost $60–75,000 at a residential facility or $30,000 if provided on an outpatient basis.

Peralta does not make any claim for lost wages. The damages he does seek consist of various anticipated ongoing expenses for health care and a gym membership, plus money to compensate him for his pain and suffering. According to Dr. Rafiy, Peralta has a permanent loss of flexion and extension in his lower back as well as diminished reflexes. Dr. Rafiy opined that this amounts to a permanent partial limitation of Peralta's use of his spine. Dr. Rafiy further testified that Peralta's condition will require two visits to an orthopedic expert each year, at a cost of $700 per year; an MRI every two to three years, at a cost of $1300 per scan; pain injections three to four times per year, at a cost of $950 per visit; and a gym membership for ten years. Since Peralta was twenty-three years old at the time of trial, (*see* Pl.'s Ex. 1), he has a life expectancy of approximately fifty-two years. (*See* Bureau of Labor Statistics, Expectation of Life at Birth, 1970–2008, and Projections, *available at* http://www.census.gov/compendia/statab/cats/births_deaths_marriages_divorces/life_expectancy.html).

B. *Conclusions of Law*

■ Under New York's no-fault insurance law, a plaintiff injured in an automobile accident may not recover damages for non-economic losses unless he has sustained a "serious injury." N.Y. Ins. Law § 5104. Although a "serious injury" may be established in several different ways, in this case Peralta contends that he has suffered a permanent loss of range of motion in his spine. Under New York's no-fault law, such a permanent consequential limitation of the use of a body or member constitutes a serious injury. *Id.* § 5102(d).

Quintero seeks to refute Peralta's showing that he sustained a serious injury in several ways. First, he contends that Dr. Rafiy's testimony was insufficient to meet Peralta's burden because there were no range of motion studies immediately after the accident. Within a matter of days, however, Peralta went to Davidson Medical complaining of, *inter alia,* middle and lower back pain and stiffness. (He also had left shoulder pain.). Although a range of motion study that same month apparently does not reflect extensive limitations

in Peralta's range of motion, Peralta nonetheless consistently complained of lower back pain and spasms. Indeed, Dr. Jacob Esses of Davidson Medical diagnosed Peralta with a spinal and extremity impairment on May 8, 2010, shortly after the accident. Dr. Anthony Mandracchia, a chiropractor, similarly diagnosed him with lumbosacral plexopathy, albeit without motor deficit, the following month. That same month, a neurologist at Davidson Medical also evidently reported that Peralta had an antalgic gait and difficulty getting on and off the examining table. Finally, according to Dr. Rafiy, an MRI of Peralta's lumbar spine taken in April 2010 reflected foraminal damage at the L4–L5 level that he considered the likely cause of Peralta's pain. Since treating this problem required that instrumentation be installed in Peralta's back, it is apparent that Peralta suffered a "serious injury" entitling him to recover non-economic damages. *See* N.Y. Ins. Law §§ 5102(d), 5104. To the extent that the two medical experts called by Quintero disputed Dr. Rafiy's testimony that Peralta had sustained a serious injury, I do not credit their testimony.

■ Quintero also argues, based on the testimony of defense experts, that Peralta's continuing back problems are not causally related to the March 2010 accident because the surgical procedures performed by Dr. Rafiy were not medically necessary, but instead were performed for Dr. Rafiy's financial gain. Quintero further attacks Dr. Rafiy's credibility on numerous grounds.

There is no reason to believe that Dr. Rafiy performed surgery on Peralta's spine simply for financial gain. Moreover, it defies credulity to argue that Peralta would have opted for an invasive surgical procedure, accompanied by the placement of instrumentation in his spine, simply to bolster his damages case. Indeed, the only logical conclusion from Peralta's willingness to undergo surgery after other treatment modalities failed is that he was, indeed, in considerable pain.

■ Moreover, even if Quintero were able to establish that Dr. Rafiy's decision to perform surgery constituted medical malpractice, that would not be a basis for Quintero to escape financial responsibility for the surgery's sequelae. Indeed, it is settled law in New York that a tortfeasor is responsible for the subsequent negligence of a physician because "their wrongs coalesced and resulted in damage which would not have been sustained but for the original injury." *Milks v. McIver*, 264 N.Y. 267, 269, 190 N.E. 487 (1934); *see Musco v. Conte*, 22 A.D.2d 121, 254 N.Y.S.2d 589, 594 (2d Dep't 1964) (defendant whose wrongful act caused injury aggravated by physician's negligence may be liable to plaintiff for full damages, subject to the defendant's right to seek indemnity).

■ Turning first to Peralta's economic damages, I credit Dr. Rafiy's testimony that Peralta likely will need continuing orthopedic care for the rest of his life by virtue of the accident and subsequent surgery. Accordingly, I award Peralta $60,000 for future medical expenses. There is no indication, however, that Peralta made any attempt to attend a gym after his surgery or has the inclination or need to pursue what amounts to a frill; I therefore decline to award any money for a gym membership. Similarly, while I do not doubt that Peralta has suffered pain and continues to suffer pain, my own observations of him during the trial cause me to believe that at least some of the physical discomfort he sought to exhibit both on and off the stand during the trial was feigned. I therefore decline to award Peralta the $1,000,000 for pain and suffering

that he seeks and instead award him $100,000 for past pain and suffering and $250,000 for future pain and suffering. Finally, although Peralta testified that he is addicted to Oxycontin and Dr. Rafiy—who has continued to prescribe the drug—evidently agrees, there is no indication that Dr. Rafiy has particular expertise in the field of substance abuse, much less knowledge regarding the current cost and necessary duration of treatment programs. For this reason, 1 decline to award any damages for the treatment of Peralta's alleged addiction.

## III. *Conclusion*

The Clerk of the Court shall enter judgment in favor of Peralta in the amount of $410,000 and close this case.

SO ORDERED.